1  **WO**

2

3

4

5

6                IN THE UNITED STATES DISTRICT COURT

7                    FOR THE DISTRICT OF ARIZONA

8

9   Robert Glen Jones, Jr.,              )  No. CV 03-478-TUC-DCB
                                         )
10              Petitioner,              )  <u>DEATH PENALTY CASE</u>
                                         )
11  v.                                   )
                                         )  **MEMORANDUM OF DECISION**
12  Charles L. Ryan, et al.,[1]          )  **AND ORDER**
                                         )
13              Respondents.             )
                                         )
14  _____  )
                                         )
15

16        Robert Glen Jones, Jr. (Petitioner) has filed an Amended Petition for Writ of Habeas

17  Corpus pursuant to 28 U.S.C. § 2254, alleging that he is imprisoned and sentenced to death

18  in violation of the United States Constitution.  (Dkts. 27, 28.)[2]  For the reasons set forth

19  herein, the Court determines that Petitioner is not entitled to habeas relief.

20                          <u>**PROCEDURAL HISTORY**</u>

21        Following trial in June 1998, a jury convicted Petitioner on six counts of first-degree

22  murder for killings that occurred two years earlier during robberies of the Moon Smoke Shop

23  and the Fire Fighters Union Hall in Tucson.  Petitioner was also convicted of first-degree

24  attempted murder, aggravated assault, armed robbery, and first-degree burglary.

25        At sentencing, Pima County Superior Court Judge John Leonardo found numerous

26  _____

27        [1]     Charles L. Ryan, Interim Director of the Arizona Department of Corrections,
    is substituted for his predecessor pursuant to Fed. R. Civ. P. 25(d)(1).

28        [2]     "Dkt." refers to the documents in this Court's file.

statutory aggravating factors: conviction of another offense for which a sentence of life imprisonment or death was imposable under A.R.S. § 13-703(F)(1); previous conviction of a serious crime, whether preparatory or complete, § 13-703(F)(2); offense committed as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value, § 13-703(F)(5); offense committed while in the custody of or on authorized or unauthorized release from the State Department of Corrections, a law enforcement agency or a county or city jail, § 13-703(F)(7); and conviction of one or more other homicides which were committed during the commission of the offense, § 13-703(F)(8). After weighing the aggravating and mitigating factors, Judge Leonardo sentenced Petitioner to death.[3]

The Arizona Supreme Court affirmed the convictions and sentences. *State v. Jones*, 197 Ariz. 290, 4 P.2d 345, (2000). A petition for certiorari was denied. *Jones v. Arizona*, 532 U.S. 978 (2001). Subsequently, Petitioner sought state post-conviction relief (PCR) under Rule 32 of the Arizona Rules of Criminal Procedure. Judge Leonardo denied PCR relief in a detailed 32-page ruling, and the Arizona Supreme Court summarily denied review. Petitioner thereafter initiated the instant habeas proceedings.

## APPLICABLE LAW

Because it was filed after April 24, 1996, this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254 (AEDPA). *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *see also Woodford v. Garceau*, 538 U.S. 202, 210 (2003).

**I.    Principles of Exhaustion and Procedural Default**

Under the AEDPA, a writ of habeas corpus cannot be granted unless it appears that the petitioner has exhausted all available state court remedies. 28 U.S.C. § 2254(b)(1); *see*

---

[3]    At the time of Petitioner's trial, Arizona law required trial judges to make all factual findings relevant to capital punishment and to determine sentence. Following the Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002), which held that a jury must determine the existence of facts rendering a defendant eligible for capital punishment, Arizona's sentencing scheme was amended to provide for jury determination of eligibility factors, mitigating circumstances, and sentence.

*Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Rose v. Lundy*, 455 U.S. 509 (1982). To exhaust state remedies, the petitioner must "fairly present" his claims to the state's highest court in a procedurally appropriate manner. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).

A claim is "fairly presented" if the petitioner has described the operative facts and the federal legal theory on which his claim is based so that the state courts have a fair opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim. *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 277-78 (1971). Unless the petitioner clearly alerts the state court that he is alleging a specific federal constitutional violation, he has not fairly presented the claim. *See Casey v. Moore*, 386 F.3d 896, 913 (9th Cir. 2004). A petitioner must make the federal basis of a claim explicit either by citing specific provisions of federal law or federal case law, even if the federal basis of a claim is "self-evident," *Gatlin v. Madding*, 189 F.3d 882, 888 (9th Cir. 1999), or by citing state cases that explicitly analyze the same federal constitutional claim, *Peterson v. Lampert*, 319 F.3d 1153, 1158 (9th Cir. 2003) (en banc).

In Arizona, there are two primary procedurally appropriate avenues for petitioners to exhaust federal constitutional claims: direct appeal and PCR proceedings. Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings and provides that a petitioner is precluded from relief on any claim that could have been raised on appeal or in a prior PCR petition. Ariz. R. Crim. P. 32.2(a)(3). The preclusive effect of Rule 32.2(a) may be avoided only if a claim falls within certain exceptions (subsections (d) through (h) of Rule 32.1) and the petitioner can justify why the claim was omitted from a prior petition or not presented in a timely manner. *See* Ariz. R. Crim. P. 32.1(d)-(h), 32.2(b), 32.4(a).

A habeas petitioner's claims may be precluded from federal review in two ways. First, a claim may be procedurally defaulted in federal court if it was actually raised in state court but found by that court to be defaulted on state procedural grounds. *Coleman*, 501 U.S. at 729-30. Second, a claim may be procedurally defaulted if the petitioner failed to present

it in state court and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Id.* at 735 n.1; *see also Ortiz v. Stewart*, 149 F.3d 923, 931 (9th Cir. 1998) (stating that the district court must consider whether the claim could be pursued by any presently available state remedy).

Therefore, in the present case, if there are claims which have not been raised previously in state court, the Court must determine whether Petitioner has state remedies currently available to him pursuant to Rule 32. *See Ortiz*, 149 F.3d at 931 (district court must consider whether the claim could be pursued by any presently available state remedy). If no remedies are currently available, petitioner's claims are "technically" exhausted but procedurally defaulted. *Coleman*, 501 U.S. at 732, 735 n.1.

In addition, if there are claims that were fairly presented in state court but found defaulted on state procedural grounds, such claims also will be found procedurally defaulted in federal court so long as the state procedural bar was independent of federal law and adequate to warrant preclusion of federal review. *See Harris v. Reed*, 489 U.S. 255, 262 (1989). It is well established that Arizona's preclusion rule is independent of federal law, *see Stewart v. Smith*, 536 U.S. 856, 860 (2002) (per curiam), and the Ninth Circuit has repeatedly determined that Arizona regularly and consistently applies its procedural default rules such that they are an adequate bar to federal review of a claim. *See Ortiz*, 149 F.3d at 932 (Rule 32.2(a)(3) regularly and consistently applied); *Poland v. Stewart*, 117 F.3d 1094, 1106 (9th Cir. 1997) (same); *Martinez-Villareal v. Lewis*, 80 F.3d 1301, 1306 (9th Cir. 1996) (previous version of Arizona's preclusion rules "adequate").

Nonetheless, because the doctrine of procedural default is based on comity, not jurisdiction, federal courts retain the power to consider the merits of procedurally defaulted claims. *Reed v. Ross*, 468 U.S. 1, 9 (1984). As a general matter, however, the Court will not review the merits of procedurally defaulted claims unless a petitioner demonstrates legitimate cause for the failure to properly exhaust in state court and prejudice from the alleged

constitutional violation, or shows that a fundamental miscarriage of justice would result if the claim were not heard on the merits in federal court. *Coleman*, 501 U.S. at 750.

Ordinarily "cause" to excuse a default exists if a petitioner can demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id*. at 753. Objective factors which constitute cause include interference by officials which makes compliance with the state's procedural rule impracticable, a showing that the factual or legal basis for a claim was not reasonably available to counsel, and constitutionally ineffective assistance of counsel. *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *King v. LaMarque*, 455 F.3d 1040, 1045 (9th Cir. 2006). "Prejudice" is actual harm resulting from the alleged constitutional error or violation. *Vickers v. Stewart*, 144 F.3d 613, 617 (9th Cir. 1998). To establish prejudice resulting from a procedural default, a habeas petitioner bears the burden of showing not merely that the errors at his trial constituted a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimension. *United States v. Frady*, 456 U.S. 152, 170 (1982).

## II.     Standard for Habeas Relief

For properly exhausted claims, the AEDPA established a "substantially higher threshold for habeas relief" with the "acknowledged purpose of 'reducing delays in the execution of state and federal criminal sentences.'" *Schriro v. Landrigan*, 550 U.S. 465, 475 (2007) (quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)). The AEDPA's "'highly deferential standard for evaluating state-court rulings' . . . demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)).

Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The relevant state court decision is the last reasoned state decision regarding a claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

"The threshold question under AEDPA is whether [a petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000). Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 549 U.S. 70, 76 (2006). Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. *Williams*, 529 U.S. at 381; *see Musladin*, 549 U.S. at 77. Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be "persuasive" in determining what law is clearly established and whether a state court applied that law unreasonably. *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).

The Supreme Court has provided guidance in applying each prong of § 2254(d)(1). The Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. *Williams*, 529 U.S. at 405-06; *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam). In characterizing the claims subject to analysis under the "contrary to" prong, the Court has

observed that "a run-of-the-mill state-court decision applying the correct legal rule to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406.

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. For a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable." *Id.* at 409; *Visciotti*, 537 U.S. at 25.

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based on an unreasonable determination of the facts. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*). A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El I*, 537 U.S. at 340; *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). In considering a challenge under 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Miller-El II*, 545 U.S. at 240. However, it is only the state court's factual findings, not its ultimate decision, that are subject to § 2254(e)(1)'s presumption of correctness. *Miller-El I*, 537 U.S. at 341-42.

## FACTUAL BACKGROUND

Petitioner was tried separately from his co-defendant, Scott Nordstrom. The State's primary witness at trial was Scott's brother, David Nordstrom, who had been released from prison in January 1996, following a conviction for theft. At the time of the offenses in this

case, David was living with his father and wore an ankle tracking monitor as part of his parole.

David testified that sometime prior to April 1996, he obtained a .380 semi-automatic handgun from a friend and gave it to Petitioner, who told David he wanted it for protection. On May 30, 1996, David was riding with Scott and Petitioner in Petitioner's white pickup truck when Petitioner suggested they steal a car. Petitioner was wearing his usual attire: a long-sleeved Western shirt, Levis, boots, sunglasses, and a black cowboy hat. In a parking lot near Tucson Medical Center, Petitioner broke into a VW station wagon but was unable to start it. However, he found a 9mm pistol and stated when he returned to the truck, "I've got my gun now."

The three then discussed committing a robbery, and Petitioner suggested the Moon Smoke Shop. According to David, Petitioner parked behind the store, gave Scott the .380 semi-automatic, armed himself with the 9mm pistol, and told David he and Scott would go in, rob the store, and be right out. David moved into the driver's seat and then heard gunshots. When Petitioner and Scott returned to the truck, Petitioner said, "I shot two people," and Scott stated, "I shot one." Petitioner split the money from the robbery with David and Scott.

The survivors of the smoke shop robbery testified that four employees were in the store at the time: Noel Engles, Tom Hardman, Steve Vetter, and Mark Naiman. Engles was behind the counter, Vetter and Naiman were kneeling behind it, and Hardman was sitting behind another counter. The robbers followed a customer, Chip O'Dell, into the store and immediately shot him in the head. Engles, Vetter, and Naiman were all focused on stock behind the counter and none saw the robbers or O'Dell enter. Upon hearing the gunshot, Engles looked up to see someone in a long-sleeved shirt, dark sunglasses, and dark cowboy hat wave a gun and yell to get down. Hardman fled to a back room, and Engles saw a second robber move toward the back and heard someone shout, "Get the fuck out of there!" Engles dropped to his knees and pushed an alarm button.

The gunman at the counter nudged Naiman in the head with a pistol and demanded that he open the cash register. After doing so, the gunman reached over the counter and began firing. Naiman ran out of the store and called 911 at a payphone. After hearing the gunmen leave, Engles ran out the back door to get help and saw a light-colored pickup truck carrying two people turn sharply from the back alley onto a surface street. Naiman and Engles survived, as did Vetter, despite being shot in the arm and face. O'Dell and Hardman both died from bullet wounds to the head. Three 9mm shell casings were found in the front area of the store, one near O'Dell and two near the register. Two .380 shells were found near Hardman's body in the back of the shop. Naiman provided a description of one of the gunmen, which was used by a police artist to create a composite drawing.

Two weeks after the smoke shop robbery, on June 13, 1996, the Fire Fighter's Union Hall was robbed. The Union Hall was a private club; members had to use key cards to enter, and the bartender buzzed in guests. Member Nathan Alicata discovered the bodies of the bartender, Carole Lynn Noel, as well as Maribeth Munn, Judy Bell, and Arthur Bell, when he went to the hall around 9:00 that night. The police found three 9mm shell casings, two live 9mm shells, and two .380 shell casings. Approximately $1300 had been taken from the open cash register. The medical examiner concluded that the bartender had been shot twice and suffered a blunt force trauma. The three other victims had been shot through the head at close range as their heads lay on the bar; Arthur Bell also had a contusion on the right side of his head in a shape consistent with a handgun.

David testified that on the night of the Union Hall robbery he was at his father's home, which the State corroborated with documentary records relating to his ankle monitor. According to David, Petitioner visited him at his father's home late that evening and told David that he and Scott had robbed the Union Hall. Petitioner further told David that Scott had kicked and shot the bartender because she could not open the safe and that Petitioner shot three other patrons in the back of the head. Later, David, Scott, and Petitioner threw the weapons into a pond south of Tucson. David and Scott also burned a wallet belonging to one

of the Union Hall victims.

Several months later, David saw an appeal on television for information concerning the murders and told his girlfriend, Toni Hurley, what he knew. Hurley testified that she made an anonymous call to a crime tip hotline, which led to David's contact with police. He then accurately relayed to investigators numerous details of the crimes that were not publically known.

In addition to David's testimony, the State presented important testimony from Lana Irwin. Irwin had met Petitioner in the summer of 1996, shortly after the murders, when he visited her apartment in Phoenix on several occasions. Petitioner knew Irwin's friend, Steven Coates, and sometimes stayed overnight. She testified that she overheard conversations in which Petitioner told Coates about the murders, saying he had killed four people by shooting them in the head while his partner had killed two. Although she could relay only snippets of the conversation, Irwin testified that Petitioner described shooting one man at a doorway entrance and that another man was shot in a "back room." He also talked about killing three women and an "older man" at a "bar or restaurant" that looked like a "red room" and said they had to be shut up so they didn't say anything. Irwin also said that Petitioner talked about a door being open during one of the incidents but that another door in the back of the building was closed and had to be kicked in. He further said a third accomplice, his partner's brother, waited in a truck during at least one of the incidents.

## DISCUSSION

**I.    Prosecutorial Misconduct**

In Claim 1, Petitioner raises the following allegations of prosecutorial misconduct:

A.    The prosecutor suborned perjury from detectives to bolster the credibility of witness Lana Irwin regarding a kicked-in door;

B.    The State introduced false evidence regarding the position of Arthur Bell's body;

C.    The prosecutor misconstrued police sketches;

D.    The prosecutor knowingly made a false avowal to the court about

- 10 -

David Nordstrom's phone; and

E.     The State failed to disclose clothing belonging to Petitioner.

(Dkt. 27 at 7-27.) In Claim 12, Petitioner asserts that the prosecutor made improper remarks during closing argument.  (*Id.* at 53.)

Petitioner properly exhausted Claim 12 on direct appeal but did not raise any of the allegations in Claim 1.  Instead, Petitioner presented them in his PCR petition.  (*See* ROA-PCR doc. 16 at 3-21.)[4]  Although the PCR court alternately determined that the claims were meritless, denying them in summary fashion, the court first found the claims precluded pursuant to Rule 32.2(a)(3) of the Arizona Rules of Criminal Procedure because they could have been raised on direct appeal.  (ROA-PCR doc. 70 at 3.)  Thus, the state court "explicitly invoke[d] a state procedural bar rule as a separate basis for decision."[5]  *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989).  This preclusion ruling rests on an independent and adequate state procedural bar.  *See Stewart v. Smith*, 536 U.S. 856, 860 (2002) (per curiam) (Arizona's Rule 32.2(a) is independent of federal law); *Ortiz*, 149 F.3d at 931-32 (Rule 32.2(a) is regularly and consistently applied).  Therefore, the allegations raised in Claim 1 are procedurally barred, absent a showing of cause and prejudice or a fundamental miscarriage of justice.

As cause to excuse his default, Petitioner asserts that failure to present Claim 1 properly to the Arizona Supreme Court was due to the ineffective assistance of appellate

---

[4]     "ROA-PCR doc." refers to sequentially-numbered documents in the seven-volume post-conviction record on appeal prepared for Petitioner's petition for review to the Arizona Supreme Court (Case No. CR-03-0002-PC).  "ROA" refers to sequentially-numbered pages in the six-volume record on appeal prepared for Petitioner's direct appeal to the Arizona Supreme Court (Case No. CR-98-0537-AP).  "RT" refers to the reporter's transcript.  As is custom in this District, copies of the state court records on appeal, as well as the original trial transcripts, appellate briefs, and presentencing report, were provided to this Court by the Arizona Supreme Court.  (*See* Dkt. 48.)

[5]     The Arizona Supreme Court summarily denied review without comment. Thus, with respect to this and other claims presented in his PCR petition, the trial court's PCR ruling is the last reasoned determination by a state court.

counsel. (Dkt. 27 at 38.) Before ineffective assistance of counsel may be used as cause to excuse a procedural default, it must have been presented to the state court as an independent claim. *Edwards v. Carpenter*, 529 U.S. 446, 451-53 (2000). Respondents concede that Petitioner properly exhausted this appellate ineffectiveness claim in his PCR petition. (Dkt. 34 at 46; *see also* ROA-PCR doc. 16 at 36.) The PCR court determined that appellate counsel was not ineffective because none of Petitioner's substantive claims would have been successful on appeal. (ROA-PCR doc. 70 at 27.) This Court agrees.

Where ineffective assistance of appellate counsel is raised as cause for excusing a procedural default, application of *Strickland v. Washington*, 466 U.S. 668 (1984), requires the Court to look to the merits of the omitted issue. *Hain v. Gibson,* 287 F.3d 1224, 1231 (10th Cir. 2002); *United States v. Cook*, 45 F.3d 388, 392 (10th Cir. 1995) (to determine if appellate counsel provided ineffective assistance by failing to raise an issue on appeal "we examine the merits of the omitted issue"). If the omitted issue is meritless, counsel's failure to appeal does not constitute a Sixth Amendment deprivation. *Cook*, 45 F.3d at 392-93. Because, as set forth below, the Court has determined that Petitioner's prosecutorial misconduct allegations are without merit, appellate counsel was not ineffective for failing to raise them on appeal and appellate ineffectiveness does not constitute cause to excuse Petitioner's default.

**A.    Kicked-in Door**

At Scott Nordstrom's trial, which took place approximately seven months before Petitioner's, Detective Joseph Godoy testified that police broke down a door in the back area of the Moon Smoke Shop after arriving on the scene:

> A:    In the back room there are three different areas where I found money. One was inside a drawer, one inside a brief case. Then we broke down the door. Actually broke a door, found some money in this other room back here.
>
> Q:    Okay. Let's talk about those places one at a time. The door that had to be broken into, uniform officers did that?
>
> A:    Yes.

| | | |
|---|---|---|
| Q: | The intruders didn't do that? |

A:     No, they did not.

(Dkt. 28, Ex. 2.) In addition, reports from two responding police officers – Officers Charvoz and Grimshaw – state that there was a locked room adjacent to the back area of the Moon Smoke Shop, that a key could not be found to open the door, and that consequently the door was kicked in by one of the officers. (Dkt. 28, Ex. 3.)

At Petitioner's trial, the prosecutor had Detective Godoy identify two photographs of the door that during Nordstrom's trial Godoy had explained was kicked in by police. (RT 6/18/98 at 97.) However, the prosecutor framed the question in such a way that it implied the damage exhibited in the photographs had been discovered, not caused, by police:

Q:     Let me show you two other photographs. Did you find any damage to one of the doors in the back area?

A.     Yes.

Q:     Showing you what has been marked State's 15 and 16, do those represent a door that you saw that was damaged?

A.     Yes.

(*Id.*) In addition, Detective Brenda Woolridge, who had taken Lana Irwin's statement, testified that Irwin told her something about a door being kicked in. (RT 6/25/98 at 38.) Woolridge further testified that, in fact, a door in the back area of the smoke shop had been kicked in, as shown in State's exhibit 50, and that this fact was not mentioned during Nordstrom's trial. (*Id.*)

During opening statement and closing argument, prosecutor David White argued that the evidence showed O'Dell was killed near the open front door of the Moon Smoke Shop and Hardman was killed in the back area. (RT 6/18/98 at 11; RT 6/25/98 at 130-31.) White described Hardman as running to the back at the outset of the robbery and asserted that Scott Nordstrom had kicked in a door to get to him. (*Id.*) White further noted that information about the condition of the door had not been publicly released or presented at Nordstrom's trial, and thus Lana Irwin could not have known about this fact unless she overheard it from

- 13 -

Petitioner.  (RT 6/25/98 at 131.)

Petitioner contends that the testimony of Detectives Woolridge and Godoy constituted perjury and that White must have known this in light of the fact that he had already prosecuted Nordstrom.  (Dkt. 27 at 12.)  He argues that the detectives' testimony was material "because they corroborated the story of a very important witness to the state who would not have been very credible, or helpful, if she did not know these details that she allegedly learned from Mr. Jones." (*Id.*)  Petitioner also asserts that White failed to disclose the reports indicating that officers had kicked in the door, thereby preventing trial counsel from discovering the perjury.  (*Id.* at 13.)  In support of this allegation, he has proffered affidavits from trial counsel Eric Larsen asserting that he has "no specific recollection" of receiving the reports of Officers Charvoz and Grimshaw and from appellate counsel Jonathan Young avowing that the reports were not part of the file he received from Larsen.  (Dkt. 28, Exs. 4 & 5.)

In addressing the merits of Petitioner's claim, the PCR court stated:

> The Court is aware that both detectives were intimately familiar with the details of the two cases, both attended the separate trials yet, during their testimony in the Jones trial, neither detective mentioned the fact that the subject door was kicked-in by police officers.  No objection was raised either at trial or on direct appeal.
>
> In his Response to the Petition, Prosecutor White admits to a mistake by connecting Irwin's information about a door being kicked-in with the one forced open by police but avows that it was wholly unintentional.  White claims possible confusion about the door because, in fact, there are two doors located in the same vicinity and he cites some evidence (i.e. "the photo of the bathroom door shows some kind of mark at the right height to be a kick mark") that indicates the second door may have been kicked by one of the intruders.  But the Prosecution offers the Court no further substantiation of that claim.  Additionally, White admits that although "some of the questions and answers were not technically correct," they were "literally true" and "essentially correct."
>
> Taken in context, the admissions and omissions of the State witnesses may be explained as unintentional but the mistake was exacerbated by White's opening and closing arguments in which he apparently emphasized the testimony about the kicked-in door in order to bolster Irwin's credibility.  While Petitioner sees collusion between a prosecutor and his witnesses to secure a high-profile conviction, the Court is unwilling to reach that conclusion.  However, the Court is troubled by the inconsistency in the

- 14 -

testimony between the two trials. In the Nordstrom trial, there is uncontroverted testimony that the police kicked-in the door. In the later Jones trial, an implication is developed through witness testimony (Irwin, Godoy and Woolridge) and through the opening and closing arguments that one of the intruders kicked-in the door. Petitioner argues this is significant because it is one of the key details from the overheard conversations that serve to bolster Irwin's credibility. On the other hand, the Court is aware that the testimony about the kicked-in door was but one of the many correlations between Jones' statements overheard by Irwin and the facts of the crimes. It is highly probable that the great weight of evidence elicited at trial would have resulted in Petitioner's conviction even if Irwin had not testified about the kicked-in door. In the overall context of the evidence presented at trial, the Court is convinced that the testimony concerning the kicked-in door likely did not prejudice the Petitioner nor affect the verdicts. Therefore, the claim must be rejected on the merits.

Petitioner also alleges that the Prosecution failed to disclose two police reports which document that the subject door was kicked-in by the police. Reports prepared by Officer Charvoz and Sergeant Grimshaw, both dated 5/30/96, establish that Sergeant Grimshaw instructed Officer Charvoz to kick in the door to the storage room because the door was locked and they were unable to determine if there was possibly another victim or suspect inside. Petitioner claims that, because his attorneys did not have the reports, they did not have reason to realize that Godoy and Woolridge's statements were false at trial. The Court notes that, although the subject testimony may have been misleading and may have included some omissions, the record contains no substantiation that it was false. In the bar complaint filed on this matter, S. Jonathan Young, Plaintiff's appellate attorney, alleged that Plaintiff's trial attorneys, Eric Larsen and David Braun, were adamant that they did not receive the reports. Additionally, both Larsen and Young stated in Affidavits that they did not recall the two police reports being included with the material that was disclosed by the Pima County Attorney's Office. However, the record contains correspondence from David L. Berkman, Deputy County Attorney, which documents subsequent discussions he had with Braun and Larsen in which the two attorneys expressed some uncertainty about whether the two police reports were included with the disclosure materials. Also, the County Attorney presented an Affidavit from the assigned Litigation Support Specialist who verified that the two reports were stamped "FIRST DISCLOSURE, July 28, 1997" and disclosed to Eric Larsen on that date. In his Reply, Petitioner comments that the fact that a document is stamped "disclosed" proves nothing about whether or not it was actually sent to opposing counsel. While that may be true, the Court considers that, because the stamping is part of an orderly and seemingly reliable, long-standing institutional process, it creates a rebuttable presumption that the documents were disclosed. Finding that Petitioner's unsupported allegations fail to overcome that presumption, his argument on this point must be rejected.

(ROA-PCR doc. 70 at 4-7.)

<u>False Testimony</u>

Prosecutorial misconduct will rise to a constitutional violation warranting federal

- 15 -

habeas relief only if such conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). In *Napue v. Illinois*, 360 U.S. 264, 269 (1959), the Supreme Court held "that a conviction obtained through the use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." To prevail on a *Napue* claim, Petitioner must show that (1) the testimony was actually false, (2) the prosecution knew or should have known that the testimony was false, and (3) the false testimony was material. *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc). Materiality is determined by whether there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury," in which case the conviction must be set aside. *United States v. Agurs*, 427 U.S. 97, 103 (1976). "Under this materiality standard, [t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Hayes*, 399 F.3d at 984 (quotation omitted).

Like the PCR court, this Court is troubled by the contradiction between Godoy's testimony at the Nordstrom trial and that given at Petitioner's trial. However, Petitioner is not entitled to habeas relief unless he can demonstrate that the testimony was in fact false, that the testimony was material, and that the state court's findings were objectively unreasonable. The Court concludes that he cannot make this showing.

In its response to Petitioner's state PCR petition, the State provided materials from a State Bar of Arizona disciplinary complaint against prosecutor White based on the contradictory testimony in Petitioner's and Nordstrom's trials and the alleged disclosure violation. In a letter to Staff Bar Counsel, White denied that he failed to disclose the police reports but conceded that he made a mistake of fact during Petitioner's trial:

> The Moon Smoke Shop consists of one large room, where all the selling takes place. Off the main room is a smaller storage/work area. Off of that storage/work room are two other rooms. One is an office and the other is a bathroom. Both the smaller rooms off the storage room have doors, similar to interior doors in a residence. A diagram of the business is attached as Exhibit

1  Three. When uniformed police officers arrived at the Moon Smoke Shop in
2  response to the 911 call, they kicked open the door to the small office area to
   search for additional victims and/or suspects. That fact was noted in the
3  Grimshaw and Charvoz reports and was brought out at the trial in <u>State v.</u>
   <u>Nordstrom</u>.

4      More than half a year later, as I was preparing for trial in <u>State v. Jones</u>,
5  Det. Woolridge, one of the detectives assigned to the case, brought to my
   attention that Lana Irwin knew about a door being kicked or pounded on in the
6  case. See Woolridge Affidavit, attached as Exhibit Four. I recalled a door
   being kicked in at the Moon and mis-took the door the officers kicked in with
7  the door Det. Woolridge (and Lana Irwin) was referring to – the door to the
   bathroom.

8  (ROA-PCR doc. 58, Ex. M.) In another letter to bar counsel, White's attorney in the

9  disciplinary matter further explained the layout of the smoke shop and the fact that there were

10 two adjacent doors in the back area:

11     With respect to the door in question, we have to remember that there
   were two doors. Tab 5 indicates the two doors in question. The door
12 underneath the ladder was the bathroom door, and the one in front of the ladder
   was the storage door. If you take a look at Tab 3, you will see in the testimony
13 from Detective Edward Salgado, the lead detective on the case, that he states
   in his grand jury testimony on page 7, that there was evidence that the
14 deceased, Mr. Hardman, had locked himself in the <u>restroom</u> of the business.
   Detective Salgado indicated there was damage to that door. Also, the deceased
15 was found outside of the bathroom. In the trial of the Nordstrom case, Noel
   Engles (see Tab 4) testified on page 10, that while he was on the ground he
16 heard someone telling one of the victims in the back to "Get the fuck out of
   here." It is believed this was referenced to the victim, Mr. Hardman, coming
17 out of the bathroom. The fact that one of the eyewitnesses to the crime at the
   Moon Smoke Shop indicated that there was a demand to come out of one of
18 the back rooms, the fact that Salgado testified that there was damage to the
   <u>bathroom</u> door, the fact that the two doors in question were right next to each
19 other, and the fact that this case involved so many witnesses and so many
   exhibits led to the mistake by David White. Under Tab 6 you can see from
20 inside the bathroom door looking out, and you see where Mr. Hardman lay.
   Tab 7 shows the damage to the storage door. These doors are right next to
21 each other and Mr. White plainly mixed them up.

22 (ROA-PCR doc. 58, Ex. N.)

23     Based on its review of the record, the Court questions whether the testimony from

24 Detectives Godoy and Woolridge was plainly false. Nevertheless, even assuming it was

25 false, the Court concludes it was not material and that the state court's similar conclusion was

26 not objectively unreasonable. The testimony about the door goes solely to the credibility of

27 witness Lana Irwin. Although Irwin provided important corroborating evidence, the primary

28

evidence against Petitioner was the detailed testimony of David Nordstrom. Nordstrom described the crimes in detail, recounting his own participation in the Moon Smoke Shop robbery and the information he received directly from Petitioner concerning the Union Hall murders. Moreover, as noted by the state court, Irwin's testimony about the kicked-in door "was but one of the many correlations between Jones' statements overheard by Irwin and the facts of the crime." (ROA-PCR doc. 70 at 6.) For example, she heard Petitioner say he shot and killed four people while his partner killed two, which was corroborated by the forensic evidence indicating four of the victims were killed with a 9mm weapon, which David claimed Petitioner had used, and two with a .380 pistol, which David says Scott had used. Irwin knew that the victims had been shot in the head, that one had been shot standing by a door, and that another had been chased and shot in a back room, all of which was corroborated by eyewitnesses and forensic evidence. She also knew that Petitioner's accomplices were brothers, that one had stayed in the truck, and that at the "bar or restaurant" three women and a man who had been "pistol whipped" had been killed. (RT 6/19/98 A.M. at 72-73.) Again, this was all corroborated by other evidence at trial. Under these circumstances, the Court concludes that any false or misleading testimony on the question of the kicked-in door did not deprive Petitioner of a fair trial or undermine confidence in the guilty verdict. *See Agurs*, 427 U.S. at 103; *Napue*, 360 U.S. at 271 (holding that a new trial is not required if the false testimony could not in reasonable likelihood have affected the verdict).

Disclosure Violation

Although not cited by Petitioner, an allegation that the prosecution failed to disclose material evidence is governed by *Brady v. Maryland*, 373 U.S. 83, 87 (1963). A successful *Brady* claim requires three findings: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) the evidence was material to the issue of guilt or punishment. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been

different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985); *see also Harris v. Vasquez*, 949 F.2d 1497, 1528 (9th Cir. 1990).

As already set forth, the PCR court determined that the prosecution had in fact disclosed the reports of Officer Charvoz and Sergeant Grimshaw because the reports had been stamped as disclosed and Petitioner offered nothing other than affidavits from counsel that they had not seen them. In response to the PCR petition, the State provided disclosure cover sheets indicating that over 1,000 pages of material were disclosed in co-defendant Nordstrom's case on January 24, 1997, and that over 2,000 pages of material were disclosed on July 28, 1997, in Petitioner's case. (ROA-PCR doc. 58, Ex. M at Exs. 2 & 3.) The Charvoz and Grimshaw reports each bear separate stamps labeled "First Disclosure" and the January 24 and July 28 dates. (*Id.*) In addition, the State provided an affidavit from the prosecutor's litigation support specialist, who avowed that she personally handled the disclosure in Petitioner's and Nordstrom's cases and that review of her file indicated that the reports in question were disclosed to Petitioner's counsel on July 28, 1997. (ROA-PCR doc. 58, Ex. N at Tab 8.)

In light of the conflicting evidence presented by Petitioner and the State, the Court concludes that the state court's determination was not objectively unreasonable and that Petitioner has not overcome the presumption of correctness with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Miller-El II*, 545 U.S. at 240. Moreover, as already discussed above, testimony about the kicked-in door was not material. The state court's denial of this claim was neither contrary to, nor an unreasonable application of, controlling Supreme Court law.

## B. Arthur Bell's Body

Lana Irwin testified that she overheard Petitioner describe one of the victims as an "older man" whom he shot and left sitting in a chair with his "head back." (RT 6/19/98 A.M. at 49-50.) The medical examiner testified that when she arrived at the scene, Bell's body was

"leaning backwards over the back of the chair." (*Id.* at 7.) A photograph of Bell with his head leaning back was admitted at trial. (*Id.* at 132.) Detective Godoy did not address the position of Bell's body except to say that he was found "still in the chair." Similarly, Nathan Alicata, who discovered the crime scene at the Union Hall, testified only that Arthur Bell, the only male victim, was "sitting in a chair about four chairs, five chairs from the turn of the bar." (RT 6/18/98 at 128.) In his closing argument, prosecutor White noted that Irwin could have only known about Bell's body leaning back if she learned it from Petitioner. (RT 6/25/98 at 133.)

Petitioner asserts that White deliberately misled the jury into believing that Bell's body was found leaning back in an effort to bolster Lana Irwin's testimony.[6] (Dkt. 27 at 13-18.) In support of this claim, he cites a pretrial interview in which Alicata described Bell as "[s]lumped on the chair on the bar sort of sideways." (PCR-ROA doc. 16, Ex. 15 at 13.) He also cites three police reports, prepared by officers who cleared the scene but did not testify at trial, that Bell was found "slumped over" at the bar. (Dkt. 28, Ex. 6.) Petitioner acknowledges that two other officers described Bell's head as leaning back when they arrived, but nevertheless argues that Bell's body had to have been moved from the "slumped forward position" to "leaning back" at the time the photographs of the scene were taken. (Dkt. 27 at 17-18.) He further argues that White's misconduct is evidenced by his failure to ask Alicata or Godoy specific questions about the position of Bell's body. (*Id.*)

In denying relief on this claim, the PCR court stated:

> A review of the record shows that White did not mislead. The record includes sufficient evidence to support a reasonable conclusion that, when the

---

[6]     In his amended petition, the heading for this claim states, "The State Introduced False Evidence Involving the "Red Room" and the Position of Arthur Bell's Body." (Dkt. 27 at 13.) However, although Petitioner makes passing reference to a "red room" in the body of this claim, he does not make any direct allegations of prosecutorial misconduct involving this evidence; rather, his argument is based solely on the position of Arthur Bell's body. Therefore, the Court finds any allegation with respect to the "red room" to be too cursory to state a claim and addresses only the arguments concerning the position of Arthur Bell's body.

intruders departed the Fire Fighters' Union Hall, Arthur Bell's body was slouched in a chair at the bar with his head leaning back. Of the police officers who first arrived on the scene, two specifically stated in their report that Bell's head was leaning back. Officer Braun wrote "I could see a male in a chair at the bar. His head was leaning back." Officer Butierez was more explicit in his report: "A man was in a bar stool up by the front of the bar. He was leaning back in the stool with his head leaning back also." Two other officers, Gallego and Parrish, describe the body position as "slouched over the bar stool" and "slumped over sitting at the bar" but there is no reference to the position of the head. Additionally, Nat Alicata, the first person to arrive [at the Union Hall] after the murders, initially reported that Bell was "sitting at the chair . . . slumped on the chair on the bar sort of sideways." Later, Alicata stated to an investigator that he found Arthur Bell's body in a chair leaning backwards. The statements by Braun, Butierez and Alicata provide persuasive evidence that Arthur Bell was leaning backward when first found. Finding there is no credible evidence to support Petitioner's theory that Mr. Bell's body was moved or that Lana Irwin was provided information so that her testimony would be consistent with the "changed" body position, the Court rejects Petitioner's argument.

(ROA-PCR doc. 70 at 7-9.)

The PCR court's ruling was not objectively unreasonable. Although some of the officers' reports described Bell as slumped over, none expressly addressed the position of Bell's head. Officer Gallego stated that Bell was "slouched over another bar stool." (Dkt. 28, Ex. 6.) Officer Parrish described Bell's body as "slumped over sitting at the bar," and Officer Poblocki recounted in his report that witness Nat Alicata saw Bell "sitting on a bar stool slumped over the bar." (*Id.*) The phrase "slouched over" does not necessarily mean slouched forward versus backward. Moreover, two other officers expressly stated that each observed Bell's head leaning back when they arrived on the scene (PCR-ROA doc. 16, Ex. 17), and this was corroborated by the medical examiner's testimony.

Even assuming the prosecution misled the jury on this point, Petitioner cannot establish prejudice. As already discussed, there were numerous other aspects of Irwin's testimony that were corroborated by independent evidence, including the fact that a man killed at the bar had been pistol whipped. The Court concludes that Petitioner has not demonstrated prosecutorial misconduct relating to the position of Arthur Bell's body.

## C. Police Sketches

Two composite sketches were prepared by a police artist based on descriptions

provided by Mark Naiman, one of the smoke shop employees. He described the robber who had aimed a gun at him as "a white male, caucasian, 25 to 30, about 5'10" to six feet" wearing "blue denim jeans with a black buttoned down shirt, a fairly worn cowboy hat, black, sunglasses and a handlebar moustache, but no kind of facial details besides that." (RT 6/18/98 at 69.) The other sketch depicted a much different looking person with a longer, narrower face that bore a resemblance to both of the Nordstrom brothers. (RT 6/24/98 at 101-02.)

During Nordstrom's trial, a witness testified that while in prison he saw the sketches and thought the one with the hat looked like Scott Nordstrom and the other resembled his brother, David. (Dkt. 28, Ex. 17.) During Petitioner's trial, Detective Edward Salgado testified on cross-examination that he applied for a search warrant based on an informant's identification of the Nordstroms as resembling the composites, and thus it was "fair to say that other people had come forward identifying other people *other than Mr. Jones* from those composites." (RT 6/24/98 at 101 (emphasis added).) On re-direct, the prosecutor clarified that there were two sketches, that the one without the hat and sunglasses had a slim, narrow face that resembled both of the Nordstrom brothers, and that it was this similarity in the sketch that "people were telling [Detective Salgado] about." (*Id.* at 102-03.)

Petitioner argues that Salgado's testimony "inaccurately suggested that the only 'discrepancy' in the identifications was over *which* of the Nordstrom brothers looked like the hatless suspect because they *both* resembled him, but that the suspect with the hat was always clearly identified as Mr. Jones." (Dkt. 27 at 20.) This, he argues, is in contravention of the evidence admitted at Nordstrom's trial in which the witness identified both Nordstroms based on both sketches and did not identify Petitioner. (*Id.*) According to Petitioner, Salgado's misleading testimony, elicited by the prosecutor, constituted misconduct and deprived him of a fair trial because it allowed the jury "to falsely believe that witnesses had consistently identified Mr. Jones from the sketches." (*Id.* at 20-21.)

In rejecting this claim, the PCR court stated, in pertinent part:

Next, Petitioner alleges that Detective Salgado gave testimony that was intended to deliberately mislead the jury by conveying the false impression that Jones, David, and Scott Nordstrom were the only people who had been identified from the police composite sketches. . . .

The court would reject this argument. The objectionable testimony cited by Petitioner occurred during Prosecutor White's redirect examination of Detective Salgado. Earlier, in Mr. Larsen's cross-examination of the witness, he had established that other people had come forward identifying people other than Jones from the composites. The Court notes that Robert Jones was on trial. Jones was a known associate of the Nordstrom brothers. In an earlier trial, Scott Nordstrom had been convicted of first-degree murder for the same crimes. White's redirect of Salgado appears to the Court as a reasonable line of questioning given Jones' connection with the Nordstroms and the fact that the police identified the brothers as initial suspects in the investigation. Salgado's testimony did not prejudice Jones nor did it violate Jones' right to a fair trial and due process as claimed in the Petition.

(ROA-PCR doc. 70 at 9-10.)

Even assuming the prosecutor misled the jury on this narrow point, an abundance of other evidence, unrelated to the sketches, supported Petitioner's conviction – in particular, the detailed, corroborated testimony of David Nordstrom concerning the crimes and the testimony of Lana Irwin. In addition, it is undisputed that the description of the assailant provided by Naiman bore a resemblance to Petitioner's build and dress style as testified to by other witnesses, including Nordstrom and David Evans. In fact, Evans testified to a conversation between Petitioner, Chris Lee, and himself during which they discussed Petitioner's similarity to one of the sketches and Lee asked Petitioner whether he was involved. (RT 6/19/98 P.M. at 98.) Petitioner responded, "If I told you, I'd have to kill you." (*Id.*) He further remarked, "You don't leave witnesses." (*Id.* at 99.) At another point, Petitioner told Evans he needed to leave Tucson and go to Phoenix because he had killed someone. (*Id.* at 105.) The overwhelming evidence of guilt unrelated to the sketches renders any alleged "false impression" inconsequential. Petitioner has not shown that White's conduct denied him a fair trial nor does this issue undermine confidence in the verdict. The state court's denial of this claim was not objectively unreasonable.

## D. David Nordstrom's Phone

Fritz Ebenal, David Nordstrom's parole officer, testified that David was subject to

electronic monitoring via an ankle bracelet with a transmitter which allowed authorities to monitor his whereabouts. (RT 6/23/98 at 242.) The ankle bracelet was synced with a small computer, which was attached to a phone line in David's home and programmed to alert authorities if David left the vicinity of the computer inside the home. (*Id*. at 243-44.) According to Ebenal, David had a curfew as a condition of parole that required him to be home by 7:15 p.m. on the evening of June 13, 1996, the date of the Union Hall murders. (*Id.* at 259.) He stated that the electronic monitor revealed no curfew violation that night, indicating that David was at home after 7:15 p.m. (*Id.* at 259, 262.)

Rebecca Matthews, a parole supervisor, testified that the electronic monitoring system at David's home would provide an accurate result no matter the type of telephone used. (RT 6/24/98 at 30-31.) Matthews also testified that David's system was tested in the fall of 1997 and found to be operating properly. (*Id.* at 33-47.)

Petitioner asserts that the trial court permitted evidence of the 1997 testing by Matthews only on the prosecutor's avowal that Terri Nordstrom (David's stepmother) would testify that the tested phone was the same one used in the summer of 1996. He asserts that White knew this assurance was false because testimony at Scott Nordstrom's trial by Terri Nordstrom revealed that the 1997 test utilized a different phone than the one in operation in June 1996. (Dkt. 28, Ex. 11 at 67-68.)

In rejecting this claim, the PCR court ruled:

> The Court finds no misconduct on the part of White and certainly not the egregious conduct required by [*State v. Dumaine*, 162 Ariz. 392, 783 P.2d 1184 (1989)]. While it is true that Terri Nordstrom did testify at the earlier trial that the phones were different, she provided no testimony on that point at the *Jones* trial. Petitioner's assumption that the testimony would have been the same is not supportable. She may well have testified as Mr. White avowed. Petitioner's counsel had the opportunity at trial to resolve that issue by questioning Mrs. Nordstrom about the phones but chose not to do so. The Court is also aware that testimony by Rebecca Matthews, Parole Supervisor, settled any question concerning the relevancy of the computer printout showing [t]he results of the experiment. Her testimony established that the kind of phone used had no impact on the functioning of the monitoring system other than to cause an occasional busy signal. Because no misconduct by the Prosecutor has been established and because the Court is satisfied that the computer printout was properly admitted, the Petitioner's argument must be

1    rejected.

2    (ROA-PCR doc. 70 at 10.)

3         Leaving aside the issue of whether the prosecutor's avowal was misleading, the Court

4    agrees with the PCR court that any misleading statement was immaterial in light of the

5    testimony by Matthews – who was found by the trial court to be an expert on this technology

6    – that the type of phone used was not material to the functionality of the monitoring system.

7    Specifically, Matthews testified that the system "will record regardless of what type of phone

8    is used" and that the type of phone would not affect the system's accuracy. (RT 6/24/98 at

9    30-31.) She elaborated that although some phones might cause the backup system to get a

10   busy signal when calling the home system after an alert, "it wouldn't affect the actual

11   monitoring because the [monitoring device] still monitors what's going on, records it, and

12   it calls the computer in Phoenix." (*Id.* at 31.) The state court's ruling on this claim was not

13   objectively unreasonable.

14   **E.    Jones's Clothing**

15        Detective Woolridge testified that she obtained a black hat and a pair of western boots

16   from Carol Stevenson in March 1998. (RT 6/25/98 at 43-45.) Stevenson in turn testified that

17   she had obtained the boots from Petitioner's mother. (*Id.* at 66-68.) Believing these items

18   might be relevant in Petitioner's case, authorities had them tested for blood. (*Id.* at 45.) The

19   tests were negative. (*Id.* at 84.)

20        Petitioner contends that during a pretrial interview, prosecutor White and Detectives

21   Salgado and Woolridge "deliberately hid the fact that this hat and boots had been obtained

22   and tested, keeping exculpatory evidence from Mr. Jones' counsel." (Dkt. 27 at 23.)

23   Specifically, he contends that during an interview of the two detectives by defense counsel

24   on April 20, 1998, White remained silent while the detectives gave evasive and misleading

25   answers to his questions about whether they had found any items of clothing including hats,

26   sunglasses, and cowboy boots in connection with clothing worn by Petitioner. Three days

27   later, the State disclosed the hat, boots, and lab results to Petitioner. (ROA at 305.)

28

In rejecting this claim, the PCR court stated:

> Although disclosure of the cowboy hat, boots and lab results was not accomplished in as timely a manner as Petitioner would have preferred, the items were revealed by the Prosecutor almost two months prior to the initiation of trial. That would seem adequate time for Petitioner's counsel to prepare for trial if the items were considered potentially exculpatory evidence. Additionally, Petitioner's allegation that White and the detectives worked in concert to misconstrue the evidence and mislead Jones' counsel is not supported by the record. Although the answers provided to Petitioner's counsel by the detectives were understandably less responsive than desired, White's explanation that the detectives responded in that way because, at the time, the State could not directly link the clothing to Jones appears reasonable. In the motion hearing conducted on May 4, 1998, Mr. Larsen agreed that he had no basis for an allegation of bad faith by the State in this matter and the Court agreed, finding that the need to do further discovery "is not the fault of either side." The Court further notes that the United States Supreme Court has pointed out that the touchstone of due process in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940 (1982). The Court sees no evidence that Jones was denied a fair trial. When viewed in relation to the totality of the evidence presented by the State, the delay in disclosing the cowboy hat, boots and lab tests results to Petitioner is insufficient to sustain a claim for relief. Therefore, Petitioner's argument must be rejected.

(ROA-PCR doc. 70 at 12.) This Court agrees.

Petitioner's assertion of prosecutorial misconduct is predicated on the notion that exculpatory evidence – clothing possibly belonging to Petitioner that was obtained and tested for blood with negative results – was withheld from the defense. However, to warrant relief under *Brady*, Petitioner must establish that the government willfully or inadvertently suppressed material evidence. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). It is undisputed that, despite the evasiveness of the detectives during the April 1998 interviews, the evidence was disclosed to the defense nearly two months prior to trial. Thus, this claim fails. The state court's ruling was not objectively unreasonable.

## F. Summary of Claim 1

Petitioner's allegations of prosecutorial misconduct lack merit. As such, he has failed to establish prejudice from appellate counsel's omission of these claims on appeal, and the state court's denial of his appellate ineffectiveness claim was not based on an unreasonable application of law or determination of fact. *See Gonzalez v. Knowles*, 515 F.3d 1006, 1017

- 26 -

(9th Cir. 2008) (counsel cannot be deemed ineffective for failing to raise claims which have no merit); *Wildman v. Johnson*, 261 F.3d 832, 840 (9th Cir. 2001) (appellate counsel may not be held ineffective for failing to raise claims that have no merit). As a result, Petitioner has failed to establish cause and prejudice for the default of Claim 1's allegations in state court.

## G. Closing Argument

In Claim 12, Petitioner asserts that during closing argument the prosecutor improperly referred to the possibility of a death sentence, compared Petitioner to Ted Bundy and John Wayne Gacy, and asked the jury to return a guilty verdict on behalf of the victims and their families. (Dkt. 27 at 52-53; *see also* RT 6/25/98 at 98-99, 193-94.) Petitioner argues that these statements so infected the trial with unfairness that it amounted to a violation of due process and that the trial court erred in denying his motion for mistrial. (Dkt. 27 at 53.)

The Arizona Supreme Court thoroughly addressed this claim on direct appeal, finding that although some of the remarks were inappropriate, Petitioner was not deprived of a fair trial:

> Jones argues that the prosecution's reference to the death penalty in closing argument constituted reversible error. We have recognized that calling attention to the possible punishment is improper because the jurors do not sentence the defendant. *See State v. Cornell,* 179 Ariz. 314, 327, 878 P.2d 1352, 1365 (1994). Jones, however, has taken the challenged statement out of context.
>
> In the midst of his closing, during his explanation of reasonable doubt, the prosecutor made a single reference to the death penalty:
>
> > This is a first-degree murder case and one of the possible sentences – it's up to the Judge, of course – is the death penalty. The State has to prove a case beyond a reasonable doubt, and that burden, beyond a reasonable doubt, is exactly the same in this case as it is in a burglary case or a drunk driving case. The burden does not get higher because of the nature of the charges.
>
> (R.T. 6/25/98, at 98-99.) This statement is the only reference to the death penalty in over 100 pages of closing argument. Jones did not ask for a curative instruction; he only made a general objection. We hold the statement does not constitute reversible error because it does not violate either of the concerns in [*State v. Hansen*, 156 Ariz. 291, 296-97, 751 P.2d 951, 956-57 (1988)].
>
> First, the reference to the death penalty does not call attention to a fact that the jurors would not be justified in considering during their deliberations.

In fact, the prosecutor stated that the possibility of the death penalty should *not* influence a determination of reasonable doubt. Second, the probability that the statement improperly influenced the jurors was very low. The jurors had been told from the very beginning of the trial, through both direct statements and voir dire questions, that the prosecution was seeking the death penalty. The prosecutor did not commit misconduct by making a brief reference to the death penalty in the context of discussing the burden of proof.

The second statement at issue concerns the reference to noted serial killers. Jones argues that these references were irrelevant and used only to inflame the jury. During the closing, the prosecutor stated:

> The defendant is a nice guy. He's polite. I don't think there is any natural law or genetic evidence that murders aren't also polite. Have you heard of Ted Bundy? John Wayne Gacy? Serial murderers, and I am not calling him a serial murders [sic], who were very polite. Politeness has nothing to do with it.

(R.T. 6/25/98, at 193.) The state concedes that there was no mention of either Bundy or Gacy during the actual trial. It does not agree, however, that the prosecutor necessarily committed error when referring to them. Lower courts have recognized that jurors may be reminded of facts that are common knowledge. *See State v. Adams,* 1 Ariz. App. 153, 155, 400 P.2d 360, 362 (1965). The prosecutor, by referring to famous serial killers, did not introduce evidence completely outside the realm of the trial, but rather drew an analogy between Jones's attitude at trial and that of well-known murderers. The error, if any, could not have affected the outcome of the trial.

Finally, Jones argues that the prosecution's plea for a guilty verdict on behalf of the victims and their families requires a reversal. Although this reference involves more questionable statements, it does not rise to the level of misconduct.

In *State v. Ottman,* we held that the prosecutor's statements concerning the victim's wife were improper, but did not reverse because the trial court gave a limiting instruction. 144 Ariz. 560, 562, 698 P.2d 1279, 1281 (1985). The facts of that case are far more egregious than those considered here. In *Ottman,* the prosecutor asked the jury to

> think of another woman [the victim's wife] who will be waiting for your verdict too.
>
> On December 16th at about 7:30 in the evening she had everything to look forward to. She had her house here, they were retired, husband had a part-time job, her children are fine and well in New Jersey and at 9:30 she's at the hospital with her husband and he's dead. I can guarantee you that her life is totally destroyed. She had nothing to look forward to, nothing.
>
> You may think sympathy for someone else but in terms of that woman, she wants justice and that's your duty to as jurors.

*Id.* Yet, even in light of these emotional remarks, we found any error was cured because the trial judge admonished the jury to ignore statements invoking sympathy. In contrast, the prosecutor in this case made a single remark: "I ask that you find him guilty on behalf of those people and their families and the people of the State of Arizona." (R.T. 6/25/98, at 194.) The prosecutor did not attempt to inflame the jury or make an emotional plea to ease the suffering of the poor families. Those statements do not rise to the level of misconduct. Thus, the trial court properly denied the motion for a mistrial.

*Jones*, 197 Ariz. at 305-07, 4 P.3d at 360-62.

In determining if a defendant's due process rights were violated by a prosecutor's remarks during closing argument, a reviewing court "must consider the probable effect of the prosecutor's [comments] on the jury's ability to judge the evidence fairly." *United States v. Young*, 470 U.S. 1, 12 (1985). To make such an assessment, it is necessary to place the prosecutor's remarks in context. *See Boyde v. California*, 494 U.S. 370, 385 (1990); *United States v. Robinson*, 485 U.S. 25, 33-34 (1988); *Williams v. Borg*, 139 F.3d 737, 745 (9th Cir. 1998). In *Darden*, for example, the Court assessed the fairness of the petitioner's trial by considering, among other circumstances, whether the prosecutor's comments manipulated or misstated the evidence; whether the trial court gave a curative instruction; and the weight of the evidence against the accused. 477 U.S. at 181-82.

The Court concludes that none of the allegedly improper remarks, considered either separately or cumulatively, so infected the trial with unfairness as to deny Petitioner his federal constitutional rights. None of the references misstated the evidence, and the record does not indicate that Petitioner sought a curative instruction. Moreover, the trial court instructed the jury that statements made by counsel during argument are not evidence and that its verdict must be based only on admissible evidence presented during trial. (*See* RT 6/25/98 at 197.) Finally, there was substantial evidence of Petitioner's guilt. The Arizona Supreme Court's rejection of this claim was not based on an unreasonable application of the law or determination of the facts.

## II.     Ineffective Assistance of Counsel

In Claim 2, Petitioner asserts numerous allegations of ineffective assistance of trial

counsel.  Respondents acknowledge these claims were properly exhausted in state court. (Dkt. 34 at 33.)

To prevail on a claim of ineffective assistance of counsel, a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. at 687-88.  The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.  To prove deficient performance, a defendant must also overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* To demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Trial counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"; "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Hayes v. Woodford*, 301 F.3d 1054, 1066 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 691).  To determine whether the investigation was reasonable, the court "must conduct an objective review of [counsel's] performance, measured for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (citation and quotation marks omitted).  "In judging the defense's investigation, as in applying *Strickland* generally, hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made and by giving a 'heavy measure of deference to counsel's judgments.'" *Rompilla v. Beard*, 545 U.S. 374, 381 (2005) (quoting *Strickland*, 466 U.S. at

689, 691).

With respect to *Strickland*'s second prong, a petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

A court need not address both components of the inquiry, or follow any particular order in assessing deficiency and prejudice. *Strickland*, 466 U.S. at 697. If it is easier to dispose of an ineffectiveness claim on the ground of lack of prejudice, without evaluating counsel's performance, then that course should be taken. *Id.*

Under the AEDPA, this Court's review of the state court's decision is subject to another level of deference. *Bell v. Cone*, 535 U.S. 685, 698-99 (2002); *see Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009) (noting that a "doubly deferential" standard applies to *Strickland* claims under the AEDPA). Therefore, to prevail on this claim, Petitioner must make the additional showing that the state court, in ruling that counsel was not ineffective, applied *Strickland* in an objectively unreasonable manner. 28 U.S.C. § 2254(d)(1).

## A.    Failure to Investigate David Nordstrom

Petitioner contends that if trial counsel had been more diligent in investigating David Nordstrom, he would have discovered "a false report by David that [Scott] Nordstrom had threatened his family, as well as David's efforts to set up a scam to sue Pima County." (Dkt. 27 at 28.) To support the latter assertion, Petitioner cites interviews conducted by police with two individuals, Buddy Carson and Eddie Santa Cruz. Specifically, Petitioner contends:

> When Officer Mace met with Carson, Carson gave him three handwritten notes that Carson claimed he had received from David. One of the notes concerns a scheme that David had devised to have someone assault him while he was in jail so that he could sue Pima County. This scheme was repeated in a second coded note given to Carson from David and turned over to Mace. The materials given to Mace were analyzed by a forensic document analyst who found that they were all authored by David. In addition, another inmate,

Eddie Santa Cruz, gave a statement corroborating Carson and implicating David, rather than Mr. Jones, in the murders.

(*Id.* (citations omitted).)

In rejecting this claim, the state PCR court stated:

> Petitioner alleges that Jones' trial counsel did not properly investigate false reports by David Nordstrom that Scott Nordstrom threatened his family and himself or his related letters to Buddy Carson to try to set up a scam to sue Pima County. [The] Court is unwilling to find fault when conclusory allegations are not supported by substantive argument. To the contrary, the record reflects evidence that trial counsel gave attention to these matters but determined that other issues should take priority. Moreover, the record reflects at least two instances that establish that the reports that Scott Nordstrom threatened both David and his family were credible. The record also indicates that trial counsel was well aware of both Buddy Carson and Eddie Santa Cruz but decided that presentation of either individual would have been detrimental to his case. Which witnesses to present, or whether to present any witnesses, are strategic decisions left to the professional discretion of the attorney. *State v. Dalgish*, 131 Ariz. 133, 139-40 (1982). It is not likely that there was any prejudice to the defense. Both the trial court and the Arizona Supreme Court concluded in *Nordstrom* that Carson's testimony could not have effected the outcome of that case and there is no reason to believe that he would have had any greater impact in *Jones*. Also, Santa Cruz' reputation as a notorious jailhouse snitch likely would have opened him up to a damaging impeachment by the defense.

(ROA-PCR doc. 70 at 18.) The Court agrees.

Petitioner provides no evidence to support his claim that David faked a threat from his brother. Conversely, the record indicates that Nordstrom's defense counsel stipulated during Scott's trial that Scott had sent David a note threatening to kill him. (ROA-PCR doc. 58, Ex. I.) In addition, Detective Woolridge stated in a report that Buddy Carson informed her that Scott said he was going to kill David. (ROA-PCR doc. 58, Ex. U at 3.)

Nor has Petitioner provided any evidence to support his assertion that counsel failed to investigate these issues, as opposed to exercising his professional judgment not to call Buddy Carson and Eddie Santa Cruz as witnesses. The PCR court concluded that counsel was aware of Carson and Santa Cruz and chose not to call them because of their lack of credibility. Both were convicted criminals and the PCR court noted that Santa Cruz was "a notorious jailhouse snitch." Petitioner has not contested these findings.

Finally, Petitioner cannot establish prejudice from the alleged failure to call Carson

or Santa Cruz. The record reveals that "the defense attacked David's credibility on every basis." *Jones*, 197 Ariz. at 300, 4 P.3d at 355. For instance, counsel brought out that David was a convicted felon, habitually used drugs and alcohol, violated the terms of his probation (including his curfew), obtained no steady employment, possessed illegal firearms, falsified employment records, and lied to police. (RT 6/23/98 at 161-64.) David's stepmother called him a "liar," and his natural mother characterized him as a "manipulative," "conniving," and "untruthful" person. (RT 6/25/98 at 55, 85.) In addition, the defense impeached David numerous times with prior inconsistent statements to police and pointed out that he received virtually no punishment for his admitted role in the Moon Smoke Shop murders. Finally, defense counsel argued to the jury that David was the triggerman, based on his admitted participation in the smoke shop murders and his possession of the .380 handgun. (RT 6/18/98 at 37-38; RT 6/25/98 at 156-58.) Given the abundance of damaging impeachment evidence presented at trial and defense counsel's aggressive use of it to attack David's credibility, it is not reasonable to conclude that additional allegations from Carson and Santa Cruz would have resulted in a different verdict. The PCR court's ruling was not based on an unreasonable application of *Strickland* or an unreasonable determination of the facts.

### B.    Failure to Investigate Kicked-In Door

Petitioner contends that if counsel had been better prepared he could have pointed out inconsistencies in the testimony provided by Detectives Woolridge and Godoy with respect to the kicked-in door at the Moon Smoke Shop. He asserts that the implication that the robbers kicked in the door is not accurate and that this information could have impeached Lana Irwin's testimony. (Dkt. 27 at 29.)

In denying relief on this claim, the PCR court stated, in pertinent part:

> The kicked-in door was but one of the dozen or so correlations with the facts of the crime that were adduced from the testimony of Lana Irwin about the conversations she overheard between Jones and Coates. The Court is not convinced that, had an issue been made of the kicked-in door, it would have shaken the credibility of Irwin or changed the outcome of the trial.

(ROA-PCR doc. 70 at 19.) This Court agrees.

- 33 -

As already noted with respect to Claim 1-A, the issue of the "kicked-in" door was merely one small part of the totality of Lana Irwin's testimony, much of which was corroborated by other evidence. In addition, although Irwin provided important evidence, David Nordstrom was the State's primary witness. Finally, had counsel further investigated and pursued the door issue, the State would likely have clarified the existence of two doors in the rear area of the smoke shop and argued that although police kicked in the storage room door, that fact did not eliminate the possibility that Nordstrom had kicked or struck the bathroom door to get to Hardman. Engles overheard one of the robbers shout (presumably to Hardman) to "[g]et the fuck out of there," Hardman's body was found in front of the bathroom, and the bathroom door had some kind of mark possibly indicating it had been kicked. Thus, the Court concludes there is no reasonable probability of a different verdict had defense counsel more thoroughly investigated the kicked-in door issue.

## C. Failure to Challenge David Nordstrom's Alibi

Petitioner argues that counsel failed to effectively challenge David Nordstrom's alibi that he could not have been present during the Union Hall murders because the electronic monitoring system indicated he was at home. (Dkt. 27 at 29.) Specifically, Petitioner contends that counsel should have more effectively challenged Ebenel's and Matthews's testimony about the electronic monitoring system used to verify David's whereabouts. (*Id.* at 29-30.) Petitioner also contends that additional witnesses could have testified that Petitioner was sometimes out past curfew. (*Id.* at 30.)

The PCR court rejected this claim:

It appears to the Court that Petitioner's issue is dissatisfaction with the method used by trial counsel to challenge David Nordstrom's alibi and not that a challenge was not mounted. The record shows that trial counsel did pursue a strategy of attacking the accuracy of the parole records and arguing that the alibi could not be supported. Petitioner argues that trial counsel should have attacked David's alibi by calling other witnesses. The Court is not willing to speculate on what results would have been achieved had trial counsel followed the approach now recommended by Petitioner. The standard articulated by *Strickland* is whether counsel's performance was deficient and that "but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. Proof of effectiveness must be a demonstrable

reality rather than a matter of speculation.

(ROA-PCR doc. 70 at 19.)

Review of the trial record indicates that counsel cross-examined Ebenal and Matthews on the reliability of the electronic monitoring system as well as the record keeping relating to it. Ebenal admitted that the system was not fool-proof. (RT 6/23/98 at 262.) Matthews acknowledged that the system was not tested until 18 months after the night in question and that, although the same type of equipment was tested, it may not have been the same equipment in operation on June 13, 1996. (RT 6/24/98 at 48.) During closing argument, defense counsel re-emphasized that the equipment was not fool-proof and that Matthews conceded during direct examination that the equipment works only 99 percent of the time. (RT 6/25/98 at 157-58.) To bolster this argument, counsel noted that David testified he had a 5:30 p.m. curfew the day of the smoke shop murders, but that the system did not record a violation even though, by his own admission, he was present during those crimes and that they occurred after 6:00 p.m. (*Id.*) Counsel also questioned whether a test on a system 18 months after the fact revealed anything about its reliability at the time of the Union Hall murders. (*Id.*)

Petitioner contends that two other witnesses, Deborah Collins and David Nordstrom's employer, John Mikiska, could have testified that David was occasionally out at night or working beyond his curfew.[7] (Dkt. 27 at 30.) Even assuming the veracity of this evidence, it does not establish that there were *unrecorded* curfew violations. Petitioner provides no specifics as to time on these occasions nor does he allege that the monitoring system did not record curfew violations. In fact, Ebenal testified that some violations were documented when Petitioner was found to have gone to work outside of his curfew hours. (RT 6/23/98

---

[7] Deborah Collins testified during Scott Nordstrom's trial that David Nordstrom baby sat for her friend's daughter "after dark" on two occasions in May 1996. (Dkt. 28, Ex. 8.) John Mikiska testified at Nordstrom's trial that David occasionally worked late and had to call a number to let someone know when he would not be home by his curfew. (Dkt. 28, Ex. 12.)

at 250-52.)  In addition, although Petitioner testified that he had 5:30 p.m. curfew on the night of the smoke shop robbery, Ebenal could not recall David's curfew for that date and said it was 7:15 p.m. on the night of the Union Hall robbery.  (*Id*. at 259.)

The Court concludes that even if counsel had more thoroughly cross-examined Ebenal and Matthews and presented Collins and Mikiska as witnesses, there is no reasonable probability these efforts would have led to Petitioner's acquittal.  Petitioner has not shown that the state court's ruling on this claim was based on an unreasonable application of *Strickland* or determination of the facts.

### D.    Failure to Request Immunity for Zachary Jones

Petitioner's trial investigator documented that on April 23, 1998, he interviewed Zachary Jones, an inmate at the Pima County Jail where David Nordstrom was also in custody.[8]  Zachary told him that he overheard David tell another inmate that David was going to lay blame for "all my bad deeds" on Petitioner.  (ROA at 322.)  The investigator noted that Zachary Jones was willing to testify.  (*Id*. at 323.)  At some point, defense counsel learned that Zachary might exercise his rights under the Fifth Amendment and refuse to testify.

On June 17, 1998, just prior to commencement of trial, the court held a hearing "at the request of the defense who have indicated that they wish to speak I guess a second time with Zachary Jones and also as to what his position will be if he is called as a witness in this case as he apparently will be with regard to the Fifth Amendment."  (RT 6/17/98 at 2.)  Zachary's attorney stated to the court that he had advised Zachary to "take the Fifth Amendment" if called to testify.  (*Id*. at 2-3.)  Later, Petitioner's counsel told the court why he wished to call Zachary Jones to testify:

> Zachary Jones spoke at length [to my investigator] about a conversation that he had with David Nordstrom, that Zachary Jones had information from Nordstrom that: Someone out there who is almost my twin brother, I can lay all my bad deeds on, so I can have a second chance at life.
>
> He also acknowledged sending some letters to [Robert] Jones, which

---

[8]      Zachary Jones is unrelated to Robert Jones.  (Dkt. 27 at 32.)

I have, signed by Zachary Jones, outlining basically what he put into the interview with [my investigator].

(RT 6/17/98 at 6.)

At this point, the prosecutor stated:

It is the State's belief, and I believe we have a witness who will testify if need be, that there was a conspiracy in the Pima County Jail on the part of Mr. Robert Jones and other inmates to solicit inmates to fabricate accounts about David Nordstrom bragging that he had pulled the wool over the State's eyes and he had really been personally responsible for these killings.

It is our position that Mr. Robert Jones, either personally or through others, was soliciting people to make those statements.

It is my position that Mr. Zachary Jones was solicited by the defendant or others to make such a statement and did.

. . . .

Here's why I think Mr. Zachary Jones may have a valid Fifth Amendment claim. If he comes into court and says and sticks with the account that Mr. Larsen has given and I can prove that that is false, he is committing perjury.

If he comes into court and says, and I think there is some possibility that, okay, you know, I didn't ever have this conversation with David Nordstrom, he is admitting to participating in a conspiracy to commit perjury because he will have to admit that he agreed with Robert Jones to falsify the story about David Nordstrom and submit it to officials involved in a criminal investigation.

(*Id.* at 7-8.)

The following week, defense counsel again indicated his intention to call Zachary as a witness. (RT 6/25/98 at 5.) In response, Zachary's attorney reiterated an intention to have Zachary take the Fifth, noting prosecutor White's statement to the court the previous week, that if he believed Zachary testified falsely and could prove it, Zachary could be exposed to prosecution for perjury.[9] (*Id.* at 7.) At that point, Zachary was called to testify. He conceded

---

[9]    In Claim 6 of his amended petition, Petitioner characterizes the prosecutor's remarks as an improper "threat" to prosecute Zachary Jones. On direct appeal, the Arizona Supreme Court disagreed with this characterization, finding that White's statements did not constitute a threat but were instead "remarks made to the court to explain Zachary's somewhat confusing decision to invoke the Fifth Amendment." *Jones*, 197 Ariz. at 301, 4 P.3d at 356. The court further noted that nothing in the record indicates White contacted

having a conversation with Petitioner but refused to provide any details, asserting his Fifth Amendment right to remain silent. (*Id.* at 11.) The Court upheld his right to decline to answer such questions and, as a result, defense counsel did not call him as a witness. (*Id.* at 12.)

Petitioner contends that counsel performed ineffectively by not seeking immunity for Zachary Jones so he could testify to what he overheard David Nordstrom say concerning his efforts to blame Petitioner for his deeds. (Dkt. 27 at 32.)

In denying relief on this claim, the PCR court stated:

> Petitioner contends that, if immunized, Zachary Jones could have testified to statements made by David Nordstrom indicating he was laying blame on Robert Jones. The Court notes that there is some question whether a request for immunity would have been successful. Eric Larsen indicated in an interview that the prosecution clearly had no intention of granting immunity. Also, the record shows that Prosecutor White believed Zachary Jones conspired to falsely impeach David Nordstrom and probably would have withheld immunity. Absent any proof that immunity could have been obtained and, consequently, that the result of the trial would have been different, the Court is unwilling to conclude that trial counsel was ineffective. Also, the Court is not convinced that Zachary Jones would have provided exculpatory evidence. In fact, the record shows that Zachary Jones' attorney indicated his client's testimony "could be of a prejudicial nature and little, if any, probative value." Failing to meet either prong of the *Strickland* test, the claim is rejected.

(ROA-PCR doc. 70 at 20.)

The Court agrees with the PCR court that Petitioner has failed to establish that defense counsel would have obtained immunity for Zachary Jones if he had sought to do so. In fact, the prosecutor indicated that he believed the proposed testimony from Zachary was probably

_____

Zachary directly or made any personal threats concerning his testimony. *Id.* This Court agrees and finds that Petitioner has failed to demonstrate that the Arizona Supreme Court's ruling on this issue was unreasonable. Although substantial interference by a prosecutor in a defense witness's free choice to testify may violate due process, *Webb v. Texas*, 409 U.S. 95, 97-98 (1972), here White was merely informing the court of the possible effects of Zachary's testimony. *See United States v. Risken*, 788 F.2d 1361, 1370-71 (8th Cir. 1986) (finding no misconduct where prosecutor's remarks were limited to warning witness about consequences of perjury and prosecutor made no threat to prosecute witness for other crimes or to retaliate for testifying).

a fabrication. (RT 6/25/98 at 7.) Thus, any claim that counsel could have succeeded in obtaining immunity for Zachary seems unlikely and, at best, speculative. Such a claim cannot sustain a finding of constitutional ineffectiveness. Counsel is not obliged to file a motion he reasonably believes would fail. *See Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999); *Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994). Even if Zachary had testified, it is pure speculation that his testimony would have been exculpatory in light of his credibility problems, including the potential evidence alluded to by the prosecution that would show Zachary's story was false. Petitioner has failed to establish that the state court's denial of relief on this claim was based on an unreasonable application of *Strickland*.

## E.   Failure to Investigate Telephone Calls

Petitioner asserts that evidence introduced at Scott Nordstrom's trial showed that someone used a cell phone to make a series of calls to a pay phone near Petitioner's apartment in the minutes after the murders at the Moon Smoke Shop. (Dkt. 27 at 33; Dkt. 34 at 40.) The evidence established that Scott Nordstrom had access to the phone. During closing argument in Scott Nordstrom's trial, prosecutor White implied that Petitioner must have been trying to reach Chris Lee, his roommate who used that pay phone to page Petitioner. (Dkt. 28, Ex. 14.)

Petitioner contends that Lee was not his roommate at the time and thus no one would have attempted to call him at that number. He argues that the evidence shows the "only logical explanation" is that either Scott or David was calling Petitioner. He asserts that this was powerful evidence that Petitioner was not present during the Moon Smoke Shop murders and that counsel was ineffective for not further investigating the information.

In denying relief, the PCR court stated:

> Petitioner contends that trial counsel's failure to fully investigate the call made from Scott Nordstrom's cell phone on the night of the Moon Smoke Shop murders constitutes ineffective assistance of counsel. But Petitioner never articulates with any specificity evidence that the call was not investigated. In fact, there are indications in the record that Mr. Larson did look at Scott Nordstrom's cell phone and pager records. The Court notes that Petitioner's theory that the call could not have been placed by Jones calling his

- 39 -

roommate, Chris Lee, is challenged by evidence in the record that Chris Lee admitted living with Jones on May 30 and that Jones admitted to Eric Larsen that he had participated in the Moon Smoke Shop crimes. Therefore, it is not likely that the outcome of the case would have been different had trial counsel pursued Petitioner's current theory concerning the phone call. Because neither prong is satisfied, the claim is rejected.

(ROA-PCR doc. 70 at 20-21.)

The Court agrees with the PCR court that Petitioner has not established ineffectiveness. First, he has proffered no evidence to support his conclusory allegation that counsel failed to investigate the cell phone calls. Second, although according to Petitioner "there is no admissible or record evidence of Mr. Jones admitting involvement in the Moon to his trial counsel," he does not deny telling Larsen that he was there and participated. (Dkt. 46 at 29.) Rather, he argues only that Larsen's statement to this effect, given to the State's attorney during an unrecorded telephone interview, is "undercut by Larsen's later statement, in response to a Bar Complaint by Mr. Jones as a result of this statement, where Larsen explains he was recalling a 'lighthearted' conversation about general criminal principles where Mr. Jones supposedly made a comment about it being his job to do the crimes and the police's job to catch him." (*Id.*) If Petitioner told Larsen he was at the smoke shop, Larsen ethically was prohibited from putting on evidence that Petitioner was not there. In any event, the Court notes that the calls, even assuming they were not placed by Petitioner, hardly exculpate him from the Moon Shop murders and have no bearing on the Union Hall crimes. Under these circumstances, Petitioner cannot establish that counsel's alleged failure to investigate the phone records amounted to ineffective assistance of counsel or that the state court's denial of this claim was unreasonable.

## F.    Failure to Research Pretrial Publicity

Petitioner asserts that two of the facts Lana Irwin claimed to overhear from Petitioner – that the Union Hall was a "red room" and that the victims had been shot in the back of the head – had been set forth in an article in a Tucson newspaper prior to her initial statement to police. (Dkt. 27 at 34.) Petitioner contends that had counsel cross-examined Irwin on this

point he could have effectively refuted any impression that she could only have learned this information from Petitioner.

The state PCR court rejected this claim:

> Petitioner's conclusory assertions do not prove that Larsen was unaware that these details were publicly released; in fact, the record contains evidence that Eric Larsen was acutely aware of the extensive amount of pretrial coverage that appeared in the media (see Motion for Change of Venue dated 4/15/98). The record also presents strong indications that Eric Larsen conducted an aggressive cross-examination of Lana Irwin including impeachment on a number of matters. The Court considers it unlikely that Jones was prejudiced by trial counsel's decision not to ask the additional questions. Impeaching Irwin concerning media publication of the fact that the victims were shot in the head or that the room was red would not necessarily have been effective. At trial, Irwin testified that she lived in Phoenix and had not read anything or heard anything on the news about the Tucson murders. Whether she had or not is not dispositive. Release of the article in the Arizona Daily Star on December 3, 1997 does not rule out the possibility that the jury would have believed that Irwin first learned of the details of the crimes during the conversations she overheard. Petitioner's argument fails both prongs and is rejected.

(ROA-PCR doc. 70 at 21-22.) The Court agrees.

Defense counsel thoroughly cross-examined Irwin. Both during direct exam and cross-examination, Irwin testified to being a drug addict who was in jail for possession of marijuana when she met investigators. (RT 6/19/98 A.M. at 51.) She was given a reduced sentence in return for her cooperation, as well as being housed at State expense in return for her testimony. (*Id*. at 52-53.) Counsel challenged Irwin's veracity by eliciting testimony that she initially told detectives she had a dream about a red room where people were killed, a story she admits she fabricated because she initially did not want to tell them how she came to know about the crimes. (*Id*. at 51, 66-67.) Moreover, as noted by the PCR court, Irwin lived in Phoenix at the time the article was published and testified that she had not heard or read anything about the crimes and did not read newspapers. Thus, questions by counsel regarding the Tucson article would likely have bolstered, not diminished, her credibility. (*Id*. at 73-74.) The state court's determination that there was no reasonable probability Petitioner would have been acquitted had counsel questioned Irwin about the article was not based on an unreasonable application of *Strickland*.

### G.    Failure to Interview Petitioner's Parole Officer

At trial, David Nordstrom, Lana Irwin, and David Evans each testified that Petitioner changed his appearance after the murders, cutting and dyeing his hair and beard from red to black.   (RT 6/23/98 at 132; 6/19/98 A.M. at 43; RT 6/19/98 P.M. at 101.)   Petitioner contends counsel was ineffective for failing to interview and call Petitioner's parole officer, who could have testified that Petitioner's appearance did not change.

In rejecting this claim, the PCR court noted that Petitioner had provided no evidence to support his assertion that defense counsel failed to contact Petitioner's parole officer. (ROA-PCR doc. 70 at 22.)   The court also noted that the parole officer was not in contact with Petitioner after June 19, 1996, and the testimony from Nordstrom, Irwin, and Evans was that the change in Petitioner's appearance occurred after that date.   (*Id.*)

This Court agrees with the PCR court that Petitioner has failed to establish that counsel was ineffective.   Petitioner's cursory allegations are insufficient to establish ineffective assistance of counsel.   He has failed to rebut the state court finding that his parole officer had no contact with him after June 19, 1996.   *See* 28 U.S.C. § 2254(e)(1); *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir. 2001).   Nor has he provided support for his claim that counsel failed to investigate this issue.   Finally, Petitioner has not shown prejudice from this alleged omission.   The state court's rejection of this claim was not unreasonable.

### H.    Failure to Review Nordstrom Trial Transcripts

Petitioner next asserts that counsel was ineffective for failing to review the transcripts from Scott Nordstrom's trial.   He asserts that if counsel had read those transcripts he would have discovered the discrepancy in the detectives' testimony concerning the kicked-in door. (Dkt. 27 at 35.)

The PCR court rejected this claim, noting that it had already concluded "that the testimony about the kicked-in door did not prejudice Petitioner nor affect the verdicts." (ROA-PCR doc. 70 at 22.)   The court further noted that the record established that trial counsel had reviewed some of the *Nordstrom* transcripts, attended some of the *Nordstrom*

trial sessions, entered into a "common defense" agreement and exchanged information with Nordstrom's counsel, and assigned an investigator to conduct investigation concerning Nordstrom's trial. (*Id.* at 23.) As already noted, the Court agrees that Petitioner was not prejudiced by any failure of counsel in failing to highlight the discrepancies in the detectives' testimony about the door. Petitioner has not shown that the state court's rejection of this claim was unreasonable.

## I.    Conflict of Interest

In his opening statement, defense counsel Larsen stated he was "a friend with the sister of one of [the victims]." (RT 6/18/98 at 35.) Petitioner now argues that Larsen had a conflict of interest that deprived him of effective assistance of counsel and prejudiced his defense.

The PCR court rejected this claim, finding "no authority that suggests that friendship with the relative of a victim, absent proof of an actual conflict, disqualifies an attorney from representing the defendant." (ROA-PCR doc. 70 at 23-24.) This Court agrees.

To establish an ineffective assistance of counsel claim based on a conflict of interest, it is not sufficient to show that a "potential" conflict existed. *Mickens v. Taylor*, 535 U.S. 162, 171 (2002). Rather, "until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980). An actual conflict of interest for Sixth Amendment purposes is one that "adversely affected counsel's performance." *Mickens*, 535 U.S. at 171. Petitioner has not established that Larsen actively represented conflicting interests or that any conflict of interest affected his performance. *See United States v. Rodrigues*, 347 F.3d 818, 824 (9th Cir. 2003) (petitioner must allege specific facts demonstrating that counsel's relationship with a third party adversely affected the defense or prevented pursuit of viable litigation strategy). Therefore, the state court's denial of this claim was not based an unreasonable determination of the facts or application of the law.

### J. Failure to Challenge Grand Jury Testimony

Detective Salgado testified to the grand jury that "witnesses" told him that following the Moon Smoke Shop murders and the publication of sketches of the perpetrators, Petitioner changed his appearance and stopped wearing western-style attire:

> GRAND JUROR: So all we're basing this on is the statement from Mr. Nordstrom?
>
> SALGADO: That's part of it. And the fact that Robert Jones had had a vehicle that was similar to the suspect vehicle at the scene.
>
> The other witnesses that knew both David and Robert Jones, stating that Robert Jones always wore the cowboy hat and the western wear, and liked to wear sunglasses. And once the photographs were published, he immediately stopped wearing that type of clothing.

(RT 7/2/97 at 18-19.)

Petitioner contends that this information was provided solely by David Nordstrom and that Salgado gave the misleading impression that other witnesses confirmed it. He contends counsel "should have reviewed the transcripts and taken action, perhaps remanding for a determination of probable cause, because it was clear from the grand juror's question that jurors were not inclined to indict if 'all we are basing this on is the statement from Mr. Nordstrom?'" (Dkt. 27 at 36-37.)

In denying relief, the state PCR court stated:

> The record reflects that Detective Salgado had received information from at least two witnesses (David Nordstrom and Chris Lee) that Jones stopped wearing western garb. Salgado's reference to "several" people may be characterized as an exaggeration but not a falsehood as Petitioner claims nor does it provide a reasonable basis for a motion to remand. Additionally, as the State points out, the failure to seek a remand was mooted by Petitioner's conviction of the charges beyond a reasonable doubt.

(ROA-PCR doc. 70 at 24-25.)

The Court agrees that Salgado's testimony is more properly characterized as an exaggeration than an outright falsehood. As such, the Court concludes that the state court's finding that there would have been no reasonable basis for a remand to the grand jury is

based on a reasonable determination of the facts. Moreover, even assuming there was error in permitting Salgado to testify as he did, the error was harmless and any claim of ineffective assistance predicated on it cannot rise to the level of a constitutional violation. *See United States v. Mechanik*, 475 U.S. 66, 70 (holding that any error with respect to the charging decision by the grand jury is rendered harmless by subsequent conviction by the petit jury).

### K. Failure to Impeach Witnesses With Prior Inconsistent Statements

Petitioner provides no specific examples to support this assertion. Without more, this claim is insufficient to establish ineffective assistance of counsel.

### L. Failure to Take Pictures of Petitioner's Truck

David Nordstrom testified that he, Scott Nordstrom, and Petitioner rode in Petitioner's truck to the Moon Smoke Shop. However, witness Noel Engles, one of the shop employees, testified that immediately after the robbery he ran out the back door and saw two people in a light-colored truck driving away. (RT 6/18/98 at 54.) To counter this testimony, the State presented staged photos of a truck with three people in the cab but with the person in the middle "bending forward" so as not to be visible. (RT 8/24/98 at 86-90.)

Petitioner contends that defense counsel should have staged his own presentation by taking pictures of a truck like Petitioner's to refute the State's demonstration and to show how unlikely it would have been for three individuals the size of Petitioner and the Nordstroms to be seated in the cab of Petitioner's truck and not be seen by Engles. (Dkt. 27 at 37.)

In denying this claim, the PCR court stated:

> Petitioner alleges ineffective assistance of counsel because Jones' trial counsel did not present photographs to show how unlikely it would have been for a witness to observe only two individuals in the truck when three were present. The State had presented the results of an experiment that demonstrated it was possible. *State v. Beaty*, supra, held that matters of trial strategy are not grounds for ineffectiveness claims. Eric Larsen chose to challenge the State's argument by devoting two pages of his closing argument to attacking the experiment and the witness's credibility. Petitioner's speculation as to the possibility of an alternate experiment is noted but there is no evidence that it would have achieved any greater degree of success. Therefore, because the claim involved trial tactics and no prejudice has been

demonstrated, the claim is rejected.

(ROA-PCR doc. 70 at 26.)

During closing argument, defense counsel vigorously challenged the prosecution's experiment showing that three adult males could have been in the car with one hidden from view. (RT 6/25/98 at 160-61.) Petitioner's assertion that counsel would have been more effective if he had taken pictures of a truck and produced his own experiment to counter the State's theory is speculative and insufficient to establish a claim of ineffectiveness. Counsel emphasized that Engles saw only two people in the truck, not three as claimed by David Nordstrom, and challenged the plausibility of the State's theory. It is unclear that producing pictures of a truck to help demonstrate this point would have significantly benefitted the defense. Petitioner has not demonstrated that the state court's ruling was based on an unreasonable application of the law or determination of the facts.

## M. Failure to Raise Issues on Appeal

Petitioner asserts that appellate counsel rendered ineffective assistance by failing to raise claims regarding prosecutorial misconduct. In Part I of this Order, the Court has already determined that appellate counsel's failure to raise prosecutorial misconduct allegations on appeal was not prejudicial; therefore, this aspect of Petitioner's claim lacks merit.

Petitioner also alleges that appellate counsel performed ineffectively by failing to raise arguments concerning mitigation evidence. Petitioner contends that "[t]here were substantial mitigation issues that should have been argued on appeal, in particular, the fact that Mr. Jones did not simply have a 'dysfunctional family background,' but was constantly and severely physically and emotionally abused during his entire youth by his mother, two different stepfathers, and grandmother." (Dkt. 27 at 38.) Petitioner cites the fact he was taught to steal cars by his stepfather "and witnessed considerable violence and abuse at a young age." (*Id.* at 39.) He contends that if appellate counsel had "argued that greater weight should have been given to these mitigating factors, there is at least a reasonable

possibility that the Arizona Supreme Court, in its reweighing, would have found that Mr. Jones should have received life sentences rather than death." (*Id.*) Respondents concede that Petitioner exhausted a general allegation of appellate ineffectiveness in his PCR petition, but contend that the specific arguments Petitioner now makes are procedurally defaulted because the new allegations are fundamentally different from the conclusory claim presented in the PCR petition. (Dkt. 34 at 48.) The Court agrees.

In his PCR petition, Petitioner asserted simply that appellate counsel "failed to raise any issues relating to mitigation at sentencing." (ROA-PCR doc. 16 at 36.) Petitioner did not assert in state court that appellate counsel should have argued as mitigating factors on appeal the fact that he suffered severe physical and emotional abuse by relatives, witnessed considerable violence and abuse at a young age, and was taught by his stepfather to steal cars. As a result, the claim raised in the amended habeas petition was not properly exhausted in state court. Because the time to present such a claim has long since passed, and because Petitioner has presented no cause for the failure to raise these allegations in his state PCR proceeding, this aspect of his appellate ineffectiveness claim is procedurally barred.

Moreover, the claim lacks merits. As noted by the PCR court in its order denying relief on Petitioner's conclusory appellate ineffectiveness claim, the Arizona Supreme Court undertook an independent review of the existence of aggravating and mitigating factors to determine if imposition of the death penalty was appropriate in this case. (ROA-PCR doc. 70 at 28-29.) The supreme court expressly noted that it was required to independently review the mitigation evidence even though Petitioner did not raise on appeal any issues regarding mitigating factors. *Jones*, 197 Ariz. at 311, 4 P.3d at 366. The court then considered whether Petitioner lacked the capacity to appreciate the wrongfulness of his conduct, was a minor participant in the crimes, and had good character. *Id.* at 311-13, 4 P.3d at 366-68. It also considered his dysfunctional family history, including the fact he was abused by his stepfathers, mother, and grandmother and was introduced to drugs by his stepfather; his history of drug abuse; the fact that he had provided emotional and financial support to his

mother and sister; his good behavior during trial; his potential for rehabilitation; familial support; and residual doubt. *Id.* at 313-14, 4 P.3d at 368-69. It is evident from a review of the Arizona Supreme Court's decision that there is no reasonable probability the outcome would have been different had appellate counsel specifically asked the court to consider, as mitigating factors in its independent review, that he suffered severe physical and emotional abuse by relatives, witnessed violence and abuse at a young age, and was taught by his stepfather to steal cars. The PCR court reasonably applied *Strickland* in rejecting this claim.

## III.    Jury Selection Issues

### A.    Erroneous Death Qualification

Prior to trial, Petitioner filed a motion asking the trial court to adhere to the standard enunciated in *Witherspoon v. Illinois*, 391 U.S. 510 (1968), to determine whether a potential juror's views on the death penalty warranted removal for cause. (ROA at 150; *see also* RT 4/20/98 at 31-32.) In response, the trial court stated:

> The <u>Witherspoon</u> case, of course, involved a situation where the jury had a participation, participating role in sentencing.
>
> And I think that what this division has always done, of course, is to ask jurors whether they can set aside whatever feelings they might have about the death penalty and exclude it from having any effect on their determination of guilt or innocence.
>
> That's what I would propose to do in this case, not exactly in the form you have proposed from <u>Witherspoon</u> because I don't think that is applicable in this case because it is a different situation altogether with the Court determining punishment and the jury having no say in it whatever.

(RT 4/20/98 at 32.)

Prior to the start of trial, the court had prospective jurors fill out a questionnaire that included the following question:

> If Robert Jones is convicted of one or more counts of first degree murder in this case, it is a legal possibility that he could receive a sentence of death. In Arizona, a jury only decides the question of whether the defendant is guilty or not guilty; the jury does *not* decide the sentence to be imposed, nor does it make any recommendation to the court on the sentence to be imposed. The matter of the possible punishment is left solely to the court. Therefore, if you serve as a juror in this case, you will be required under your oath to disregard the possible punishment and not to let it affect in any way your decision as to

guilty [sic] or innocence.  *Can you disregard the possible punishment and decide the case based on the evidence produced in court?*

*Jones*, 197 Ariz. at 303, 4 P.3d at 358.  After reviewing the completed questionnaires, the defense agreed to dismiss thirty jurors for cause based on their responses to this question as well as their opinions on media coverage.  (RT 6/15/98 at 2.)  Before agreeing to the dismissal, the defense did not request that any be subjected to further questioning.

During voir dire, the court referenced the death penalty question that had been on the questionnaire and asked if anyone had "very strong feelings one way or the other about the death penalty."  (RT 6/17/98 at 54.)  Three jurors responded and indicated support for imposition of capital punishment in the event of a conviction.  (*Id.* at 54-55.)  Defense counsel did not move to strike (although they did exercise peremptories against each), nor request further questioning.

In Claim 9, Petitioner contends that the trial court's failure to follow the guidelines provided in *Witherspoon* violated his constitutional rights.  (Dkt. 27 at 50.)  In particular, he alleges that *Witherspoon* "prohibits the exclusion of a juror who expresses qualms about capital punishment and requires that the court establish either that the juror would automatically vote against the imposition of capital punishment without regard to the evidence, or that the juror's attitude toward the death penalty would prevent him or her from making an impartial decision as to the defendant's guilt."  (*Id.*)  Instead, he contends, the trial court violated *Witherspoon* by simply telling prospective jurors "you will be required under your oath to disregard the possible punishment and not let it affect in any way your decision as to guilty [sic] or innocence."  (*Id.*; *see also* RT 6/17/98 at 15-19.)  Petitioner further contends that the language in the questionnaire used a standard found unconstitutional in *Adams v. Texas*, 448 U.S. 38 (1980).  (*Id.*)

The Arizona Supreme Court rejected this claim on appeal:

We have recognized that death-qualification is appropriate in Arizona, even though juries do not sentence: "[W]e have previously rejected the argument that, because the judge determines the defendant's sentence, the jury should not be death qualified.  We have also repeatedly reaffirmed our

- 49 -

agreement with *Witherspoon v. Illinois* and *Adams v. Texas*." Even more importantly, however, this Court has applied and adopted the more liberal *Wainright v. Witt* test. In *Wainright*, the Supreme Court took a step back from the rigid test articulated in *Witherspoon*, which required the prospective juror to unequivocally state that he could not set aside his feelings on the death penalty and impose a verdict based only on the facts and the law, and held that a juror was properly excused from service if the juror's views would "'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" The trial judge has the power to decide whether a venire person's views would actually impair his ability to apply the law. For this reason, "deference must be paid to the trial judge who sees and hears the juror." Thus, we recognize that the trial judge has discretion in applying the test; the inquiry itself is more important than the rigid application of any particular language.

Although the trial judge incorrectly stated that the *Witherspoon/Wainright* standard did not apply because Arizona juries do not sentence defendants, in fact his approach complied with the constraints of *Witherspoon/Wainright*.

*Jones*, 197 Ariz. at 302, 4 P.3d at 357 (citations omitted).

In *Witherspoon*, the Supreme Court held that a prospective juror may only be excluded if he indicates he is "irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of proceedings." 391 U.S. at 522 n.21. The court further held that the exclusion of jurors for cause "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction" violated the federal constitution. *Id*. In *Adams*, the Court held that a prospective juror's views on the death penalty could not be challenged for cause "unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court." 448 U.S. at 45. In *Wainright*, the Court reaffirmed the standard enunciated in *Adams*, holding that juror bias need not be established with "unmistakable clarity" but that dismissal for cause is appropriate if the prospective juror's views "prevent or substantially impair" his ability to follow the law. *Wainright v. Witt*, 469 U.S. 412, 424 (1985).

The Court agrees that any error by the trial court, in suggesting that the

*Witherspoon/Wainwright* standard did not apply because the jury did not determine sentence, was harmless. The questionnaire, which asked prospective jurors whether they "could disregard the possible punishment and decide the case based on the evidence produced in court," effectively met the requirements outlined in *Adams* and *Wainwright*. In addition, the court questioned jurors during voir dire on whether any had strong feelings about the death penalty. Petitioner has not argued that any prospective juror was erroneously struck for cause based on qualms about the death penalty. The Court finds that Petitioner has failed to show that his federal constitutional rights were violated or that the ruling of the Arizona Supreme Court was either contrary to or based on an unreasonable application of controlling law.

**B.      Refusal to Life Qualify Jurors**

In Claim 10, Petitioner contends that the trial court refused to "life qualify" prospective jurors in contravention of *Morgan v. Illinois*, 504 U.S. 719 (1992). In *Morgan*, the Supreme Court held:

> A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror. Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views. If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence.

504 U.S. at 729.

In rejecting this claim, the Arizona Supreme Court noted, as a threshold matter, that "[b]ecause judges, rather than jurors, sentence in Arizona, we have never held *Morgan* applies." *Jones*, 197 Ariz. at 303 n.4, 4 P.3d at 358 n.4. The court further found that the trial court's voir dire satisfied the constraints of *Morgan* because (1) defense counsel did not request any specific *Morgan*-type questions, and (2) the trial court specifically asked whether jurors had strong feelings "either way." *Id.* at 304, 4 P.3d at 359. As already noted, three

venirepersons responded that they favored application of the death penalty, but the defense neither moved to strike for cause nor requested further questioning of these individuals. Petitioner has not established that the decision of the Arizona Supreme Court rejecting this claim was either contrary to, or based on an unreasonable application of, clearly established Supreme Court law.

### C.     Unconstitutionality of Death Qualification

In Claim 11, Petitioner argues generally that "death qualifying" jurors violates his constitutional rights.  Clearly established federal law holds that the death-qualification process in a capital case does not violate a defendant's right to a fair trial and impartial jury. *See Lockhard v. McCree*, 476 U.S. 162, 178 (1986); *Wainright*, 469 U.S. at 424; *Adams*, 448 U.S. at 45; *see also Ceja v. Stewart*, 97 F.3d 1246, 1253 (9th Cir. 1996) (death qualification of Arizona jurors is not inappropriate).  As a result, the mere fact the trial court death-qualified jurors does not establish a federal constitutional violation.

### D.     Change of Venue

In Claim 13, Petitioner argues that the trial court's denial of his motion for a change of venue violated his rights to due process and an impartial jury. (Dkt. 27 at 54.)  A criminal defendant in entitled to a fair trial by "a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  Therefore, "if pretrial publicity makes it impossible to seat an impartial jury, then the trial judge must grant the defendant's motion for a change of venue." *Casey v. Moore*, 386 F.3d at 906 (citing *Harris v. Pulley,* 885 F.2d 1354, 1361 (9th Cir. 1988)).

Petitioner's motion cited adverse pretrial publicity, including newspaper and television reports describing many of the facts surrounding the crimes, emphasizing the shocking circumstances, and depicting Petitioner in a less than favorable light. (ROA at 156-69.)  Appended to the motion was a list of over 150 newspaper articles published between May 31, 1996, following the smoke shop killings, and March 1998, several months after Nordstrom's conviction. (*Id.* at 172-89.)  The list provided only the headline and about 25

words of the article.  (*Id.*)  Also appended was an extensive 63-page list of television news reports (including brief "voice over" announcements and more extensive in-depth reports). (*Id.* at 191-253.)

In denying the motion for change of venue, the trial court stated:

> Undeniably, there has been a great deal of publicity about this case.  But that in and of itself is not grounds for a change of venue.  I think the Court can take precautionary measures in choosing a jury that will insure that whoever is selected to sit as a juror can do so impartially and set aside whatever media exposure they have experienced.

(RT 4/20/98 at 3-4.)  On appeal, the Arizona Supreme Court affirmed:

> By the time Jones presented his motion to change venue, more than 850 print or television articles addressed the murders and the subsequent investigation.  Although the trial court recognized the large amount of coverage, it noted that that fact alone was insufficient to require a venue change.  Only a few of the articles mentioned Jones directly.  Furthermore, the majority of the statements concerned largely factual contentions.  The trial judge also took the precautionary steps necessary to choose an impartial jury. Thus, no presumption of prejudice arose.
>
> Additionally, Jones has failed to prove any actual prejudice.  At the outset of the voir dire, both parties stipulated to the removal of thirty venire persons, some of whom answered the written questionnaire and indicated that their feelings about the case, formulated through the media coverage, could not be changed.  Importantly, almost all of the jurors who did have exposure to the publicity stated that their exposure was negligible, and every juror who admitted he could not set aside his feelings concerning the media coverage was eventually excused.  Under the totality of the circumstances of the case, the media coverage alone was not so great as to create a presumption of prejudice, and defendant has failed to present evidence of any actual prejudice in this case.

*Jones*, 197 Ariz. at 307, 4 P.3d at 362 (citations omitted).  This Court has independently reviewed the record, examining the exhibits proffered by Petitioner for "volume, timing, and content," *Harris v. Pulley,* 885 F.2d at 1360, and concludes that the Arizona Supreme Court's characterization of the record is not based on an unreasonable determination of the facts.

Jury selection in Petitioner's trial began in June 1998, two years after the crimes. During this period, numerous items appeared in the two local newspapers: the Arizona Daily Star and the Tucson Citizen.  From June 1996 until January 18, 1997, the papers published a combined total of 32 articles, reporting on either the facts of the crimes, the loss to the

victims' families, the on-going investigation, or the upswing in violent crime generally. (ROA at 185-89.) After the Nordstrom brothers were arrested in January 1997 and through Scott's trial and conviction in December 1997, an additional 111 items appeared. (*Id.* at 173-84.) It appears from the limited information available in the record that the vast majority of these articles centered on the brothers' arrests, David's plea, the search for the weapons, and Scott's six-week trial. (*Id.*) Although Petitioner was indicted during this period, only 11 articles focused on him. (*Id.*) Of these, two described seizures of Petitioner's letters and trucks, three reported his indictment, one provided some personal background information ("Broken homes, drug abuse history link Jones, David Nordstrom," Ariz. Daily Star, Jul. 3, 1997), one revealed that Petitioner was also pending charges for a robbery-murder in Phoenix ("Jones still in custody in Phoenix murder," Ariz. Daily Star, Jul. 3, 1997), and four reported his arraignment and trial date. (*Id.* at 180-84.) Of the remaining 13 articles that appeared in the first several months of 1998, two reported that Petitioner had been charged with having a handcuff key in his cell and the remainder related to "top stories of 1997," Nordstrom's sentencing, and a lawsuit from the victims' families stemming from failure to supervise paroled felons. (*Id.* at 172-73.)

The record also contains a list of what appear to be summaries of hundreds of television broadcasts over a 15-month period. (ROA at 191-253.) Although extensive, this report includes numerous brief "sound bites" and broadcasts on multiple stations throughout each reporting day. Between January 1997 and March 1998, local television stations broadcast some kind of report concerning the smoke shop and Union Hall crimes on 99 separate days, 40 of which were during Scott's trial. (*Id.*) As with the newspaper articles, these broadcasts were mostly factual in nature and focused on the crimes and investigation, the Nordstrom brothers' arrests, David's plea deal, the search for the weapons, Scott's trial, supervision of parolees, and various other legal proceedings. (*Id.*) News stories concerning Petitioner occurred on 16 different days: five days of coverage in January and February 1997 after Petitioner was identified as the third suspect; eight days between May and August 1997

reporting on grand jury proceedings, indictment, and arraignment; two in December 1997 following Nordstrom's conviction, relating to Petitioner's impending trial date; and one in March 1998 reporting on the confiscated handcuff key. (*Id.* at 195, 197, 199-200, 205, 212-13, 215-18, 249-52.)

In addressing pretrial publicity, the United States Supreme Court has discussed two types of prejudice: presumed prejudice, where the setting of the trial is inherently prejudicial, and actual prejudice, where voir dire is inadequate to offset extensive and biased media coverage. *Murphy v. Florida*, 421 U.S. 794, 798 (1975). Petitioner argues only that the state courts should have found presumed prejudice. (*See* Dkt. 27 at 55.) A court presumes prejudice only in the face of a "trial atmosphere utterly corrupted by press coverage," *Dobbert v. Florida*, 432 U.S. 282, 303 (1977), or a "wave of public passion that would make a fair trial unlikely by the jury," *Patton v. Yount*, 467 U.S. 1025, 1040 (1984). The presumption of prejudice is "rarely applicable and is reserved for an 'extreme situation.'" *Harris*, 885 F.2d at 1361 (internal citations omitted). The Supreme Court has found presumed prejudice in only three cases: *Rideau v. Louisiana*, 373 U.S. 723 (1963); *Estes v. Texas*, 381 U.S. 532, 536 (1965); and *Sheppard v. Maxwell*, 384 U.S. 333 (1966).

In *Rideau*, the defendant's detailed 20-minute confession was broadcast on television three times. 373 U.S. at 724. In a community of 150,000, nearly 100,000 people saw or heard the broadcast. *Id.* "What the people of Calcasieu Parish saw on their television sets was Rideau, in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder, in response to leading questions by the sheriff." *Id.* at 725. As the Supreme Court explained, the televised confession "*was* Rideau's trial," and "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." *Id.* at 726 (emphasis added).

In *Sheppard*, "massive, pervasive and prejudicial publicity" prevented the defendant from receiving a fair trial. 384 U.S. at 335. Much of the publicity was not fact-based or objective, but sensational and openly hostile. For example, articles "stressed [Sheppard's]

extra marital love affairs as a motive for the crimes," while editorials characterized him as a liar and demanded his arrest. *Id.* at 340-41. Other news stories described evidence that was never produced at trial. *Id.* at 340.

In *Estes*, the Court found presumptive prejudice based on the trial's carnival-like atmosphere. A pretrial hearing was televised live and then replayed, with the broadcasts reaching 100,000 viewers. *Estes*, 381 U.S. at 550. During the hearing, "the courtroom was a mass of wires, television cameras, microphones, and photographers. The petitioner, the panel of prospective jurors, who were sworn the second day, the witnesses, and the lawyers were all exposed to this untoward situation." *Id.* at 550-51. The Supreme Court found that such media intrusion was inherently prejudicial due to its effect on the witnesses, the judge, the defendant, and, most significantly, on the "televised jurors." *Id.* at 545.

The publicity engendered by Petitioner's case presents a stark contrast with the media excesses which presumptively deprived the defendants of a fair trial in *Rideau*, *Sheppard*, and *Estes*. Here, there was no confession, let alone a televised one. Moreover, as the Arizona Supreme Court accurately observed, "Only a few of the articles mentioned Jones directly" and "the majority of the statements concerned largely factual contentions." *Jones*, 197 Ariz. at 307, 4 P.3d at 362. Thus, they were "less prejudicial than inflammatory editorials or cartoons." *Ainsworth v. Calderon*, 138 F.3d 787, 795 (9th Cir. 1998), *as amended*, 152 F.3d 1223 (9th Cir.1998); *see also Gallego v. McDaniel*, 124 F.3d 1065, 1071 (9th Cir. 1997) (adopting district court's finding that news stories were "well-balanced, factual accounts"). From the limited information provided by Petitioner, it appears the news items were not sensational or inflammatory, *see Casey v. Moore*, 386 F.3d at 908-09; *Leavitt v. Arave*, 383 F.3d 809, 826 (9th Cir. 2004), and clearly lacked the virulence or hostility of many of the stories reported in *Sheppard*. Based upon the quantity and quality of the media coverage, the Court concludes that Petitioner's trial was not one of those rare cases where pretrial publicity transformed the proceedings into a "hollow formality." *Rideau*, 373 U.S. at 726.

The Arizona Supreme Court noted that the trial court was diligent in discerning the impact that pretrial publicity had on prospective jurors. In fact, 30 jurors were excused for cause based in part on their answers regarding pretrial publicity. (*See* RT 6/15/98 at 2.) The court further noted that "almost all of the jurors who did have exposure to the publicity stated that their exposure was negligible," *Jones*, 197 Ariz. at 307, 4 P.3d at 362, a finding Petitioner does not refute. Under these circumstances, the Court concludes that the ruling of the Arizona Supreme Court was not based on an unreasonable application of clearly established law or an unreasonable determination of the facts.

## IV. Evidentiary Issues

### A. Admission of Other Bad Acts Evidence

In Claim 7, Petitioner argues that his rights to due process and a fair trial were violated when David Nordstrom commented during his testimony about Petitioner's involvement in other crimes.[10] (Dkt. 27 at 47.) In particular, David stated that Petitioner came to his house in July 1996, "[a]nd we talked about [how] he was going to rob somebody and he wanted some duct tape, so I gave him a roll of duct tape because I use duct tape in my job, so I gave him a roll of it." (RT 6/23/98 at 132.) David further stated that he stopped taking calls from Petitioner shortly thereafter "because [Petitioner] was in jail." (*Id*. at 133.) Later in his testimony, David mentioned that he kept a .380 handgun, one of the guns used in the murders, because Petitioner and Scott didn't want to keep it in Petitioner's truck because they were "felons, convicted – they were both on parole" and "[i]f they got pulled over, then they'd be in trouble having a gun." (*Id*. at 204-05.)

Noting that references to other acts were barred by his successful motion in limine, defense counsel moved for a mistrial following each of the above statements. (RT 6/23/98

---

[10]    In his amended petition, Petitioner also references "bad act" statements by Lana Irwin during her testimony. (Dkt. 27 at 47.) However, as Respondents correctly note, Petitioner's claim in state court was limited to David's statements. (Dkt. 34 at 58.) He did not properly exhaust any allegations based on Irwin's statements. Thus, this aspect of Claim 7 is procedurally barred.

at 134, 209.) In response, the court observed that there had been no reference as to why Petitioner was in jail or whether he actually committed another robbery, and the court speculated that the jury might assume he was in jail for matters related to this case. (*Id.* at 135.) The court also noted "we have had, of course, other references to non-charged conduct in this case" but agreed "it's unfortunate that the comments were made." (*Id.* at 136,138.) The court determined that a limiting instruction rather than a mistrial the appropriate remedy. (*Id.* at 138.) The court then gave the following curative instruction to the jury:

> Ladies and gentleman, references have been made in the testimony as to other alleged criminal acts by the defendant unrelated to the charges against him in this trial.
>
> You are reminded that the defendant is not on trial for any such acts, if in fact they occurred. You must disregard this testimony and you must not use it as proof that the defendant is of bad character and therefore likely to have committed the crimes with which he is charged.

(*Id.* at 143-44.)

In denying appellate relief, the Arizona Supreme Court stated:

> When unsolicited prejudicial testimony has been admitted, the trial court must decide whether the remarks call attention to information that the jurors would not be justified in considering for their verdict, and whether the jurors in a particular case were influenced by the remarks. When the *witness* unexpectedly volunteers information, the trial court must decide whether a remedy short of mistrial will cure the error. Absent an abuse of discretion, we will not overturn the trial court's denial of a motion for mistrial. The trial judge's discretion is broad because he is in the best position to determine whether the evidence will actually affect the outcome of the trial. In this case, the comments did not create undue prejudice, and the trial court did not abuse its discretion.
>
> . . . .
>
> Arizona has long recognized that testimony about prior bad acts does not necessarily provide grounds for reversal. Here, the testimony made relatively vague references to other unproven crimes and incarcerations. Furthermore, the judge gave an appropriate limiting instruction, without drawing additional attention to the evidence.
>
> Second, unlike the primary case on which Jones relies, *Dickson v. Sullivan*, 849 F.2d 403 (9th Cir. 1988), in which a court official told jurors of the defendant's previous involvement in a similar case, the statements here were unsolicited descriptions from a witness concerning a dissimilar crime. When the statements are made by a witness, whose credibility is already at issue, they do not carry the same weight or effect as a statement from a court

official, who is presumed to uphold the law. The defendant agreed during trial that the prosecution played no part in soliciting the information from David. Therefore, the statements were not as harmful as those made in *Dickson*, and the trial court did not abuse its discretion.

*Jones*, 197 Ariz. at 304-05, 4 P.3d at 359-60.

To establish entitlement to habeas relief, Petitioner must show that the improper references rendered his trial fundamentally unfair in violation of due process. *See Darden*, 477 U.S. at 181. The court has "very narrowly" defined the category of infractions that violate the due process test of fundamental fairness. *Dowling v. United States*, 493 U.S. 342, 352 (1990). Pursuant to this narrow definition, the Court has declined to hold, for example, that evidence of other crimes or bad acts is so extremely unfair that its admission violates fundamental conceptions of justice. *Estelle v. McGuire*, 502 U.S. 62, 75 n.5 (1991); *Spencer v. Texas*, 385 U.S. 554, 563-64 (1967). Moreover, to establish a constitutional violation based on the improper admission of such evidence, or by extension, the refusal of the court to grant a mistrial after it is introduced, Petitioner must show that the trial court's error had a "substantial and injurious" effect on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).

In *Jeffries v. Blodgett*, 5 F.3d 1180, 1193 (9th Cir. 1993), the court held that a reference to the defendant's prior history of imprisonment did not render his trial fundamentally unfair where "the statement was inadvertent and not a prosecutorial attempt to elicit otherwise inadmissible evidence" and "the trial court's remedial instruction to the jury cured any possible prejudice caused by the incident." Here, the reference was made inadvertently by a witness whose credibility was already at issue; the prosecution did not affirmatively seek to elicit the information. In fact, defense counsel noted that David "ignored Mr. White's and the Court's instructions and prior rulings" in making the statements in question. (RT 6/23/98 at 136, 209.) As such, this situation is more akin to *Jeffries*, where the Court found no constitutional violation, than *Dickson v. Sullivan*, 849 F.2d 403 (9th Cir. 1988), where the information was relayed by a court employee. For that reason,

and in light of the substantial evidence of guilt presented at trial, the Court concludes that any references to other acts did not have a substantial and injurious effect on the jury's verdict, and the state court's ruling in this regard was not unreasonable.

## B. Admission of Prior Consistent Statements

In Claim 8, Petitioner argues that his rights to due process, to confront witnesses, and to equal protection were violated by the erroneous admission of prior consistent statements by David Nordstrom, David Evans, and Lana Irwin.[11] (Dkt. 27 at 48-49.) With regard to Evans and Irwin, the Arizona Supreme Court determined on appeal that the statements had been properly admitted under Rule 801(d)(1)(B) of the Arizona Rules of Evidence "to rebut an express or implied charge against the declarant of recent fabrication" because both statements were made before either witness had a motive to fabricate. *Jones*, 197 Ariz. at 299, 4 P.3d at 354. Regarding Nordstrom, the court found that his prior statements were erroneously admitted under Rule 801 because his motive to fabricate necessarily arose at the time of the murders. *Id.* at 300, 4 P.3d at 355. However, the court determined that the error was harmless because the defense "attacked David's credibility on every basis" in an effort to portray him as the murderer. *Id.* "Moreover, even if Hurley's testimony had been excluded, all of David's testimony about Jones's involvement and admissions would still have been admissible." *Id.*

It is not the province of this Court to determine whether a state court properly determined a question of state evidentiary law. *Estelle*, 502 U.S. at 67-68. The mere assertion that admitting the statements violated Petitioner's federal constitutional rights does not convert a state evidentiary law ruling into a federal constitutional violation. *Shumway v. Payne*, 223 F.3d 982, 987 (9th Cir. 2000). Petitioner's claim simply challenges the propriety of the trial court's admission of the statements under the Arizona Rules of

---

[11] In state court, Petitioner framed this claim only as a violation of federal due process. Therefore, only that aspect of the claim has been properly exhausted.

Evidence. In light of the overwhelming evidence of Petitioner's guilt presented at trial, unrelated to the prior consistent statements of the three witnesses in question, the Court cannot conclude that their admission had a substantial and injurious effect on the jury's verdict. *See Brecht*, 507 U.S. at 637-38. The Arizona Supreme Court's denial of this claim was not based on an unreasonable determination of controlling federal law.

### C. Admission of Artist's Sketch

In Claim 14, Petitioner asserts that admission of the sketch resembling him in both physical appearance and dress, based on a partial description by Mark Naiman, violated his right to due process. (Dkt. 27 at 55-56.) The Arizona Supreme Court ruled that the sketch did not constitute impermissible hearsay and was properly admitted under Rule 901(b)(1) of the Arizona Rules of Evidence. *Jones*, 197 Ariz. at 308, 4 P.3d at 363.

Again, it is not the province of a federal court on habeas corpus review to pass on the propriety of a state court determination on the admissibility of evidence. *See Estelle*, 502 U.S. at 67-68. Rather, to establish a due process violation based on the erroneous admission of evidence, Petitioner must demonstrate that the admission so infected his trial with error that its admission violated his right to a fair trial. *See Darden*, 477 U.S. at 181. Considering the other evidence presented at trial, admission of the sketch did not have a substantial and injurious effect on the jury's verdict. *See Brecht*, 507 U.S. at 637-38. The Arizona Supreme Court's denial of this claim was not based on an unreasonable determination of controlling federal law.

### V. Right to Be Present

In Claim 15, Petitioner contends that his right to be present at every stage of the proceedings was violated when, on the fourth day of trial, "the court held a hearing in Mr. Jones' absence and, with the concurrence of Mr. Jones' counsel, but without Mr. Jones' approval or consent, released defense witness Andrew Sheldon from a defense subpoena based on psychiatric grounds, and released state's witness Brittany Irwin based on [defense counsel's] statement that he no longer wanted to cross-examine her prior testimony." (Dkt.

27 at 56; *see* RT 6/23/98 at 3-7.)

The Arizona Supreme Court rejected this claim on direct appeal:

> Although a defendant has the right to be present at trial, his right extends only to those situations in which his "'presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.'" Counsel may, however, "acting alone make decisions of strategy pertaining to the conduct of the trial." Criminal defendants are often bound by their counsel's strategy decisions. Here, Jones was not excluded from a proceeding that involved any actual confrontation. The jury was not present, and the trial judge did not make any determination concerning Jones himself. The defense lawyer made a strategy decision only. For these reasons, the trial court did not err in holding the proceeding outside his presence, and Jones's eighth point of error is denied.

*Jones*, 197 Ariz. at 308, 4 P.3d at 363 (citations omitted). The Court agrees that this claim is meritless.

As the Arizona Supreme Court noted, the United States Supreme Court has held that a defendant has a due process right to be present at a proceeding when his presence has a reasonably substantial relation to his opportunity to present a defense. *Snyder v. Massachusetts*, 291 U.S. 97, 105-06 (1934); *see Kentucky v. Stincer*, 482 U.S. 730, 745 (1987); *United States v. Gagnon*, 470 U.S. 522, 526 (1985). The Court has emphasized that the "privilege of presence is not guaranteed 'when presence would be useless, or the benefit but a shadow.'" *Stincer*, 482 U.S. at 745 (quoting *Snyder*, 291 U.S. at 106-07). Rather, a defendant has the right to be present only "to the extent that a fair and just hearing would be thwarted by his absence." *Id.*

Here, Petitioner fails to identify any prejudice he suffered from the release of these two witnesses or explain how his failure to attend the proceeding in question thwarted his ability to effectively defend himself against the charges. *Id.* As a result, the determination of the Arizona Supreme Court was neither contrary to, nor an unreasonable application of, controlling law.

## VI. Sentencing Issues

### A. Jury Determination of Aggravating Factors

In Claim 3, Petitioner contends he was denied the right to a jury trial on the issue of

aggravating factors relevant to imposition of the death penalty, as required by *Ring v. Arizona*, 536 U.S. 584 (2002). In *Schriro v. Summerlin*, 542 U.S. 348 (2004), the Court held that *Ring* does not apply retroactively to cases such as Petitioner's that were already final on direct review at the time *Ring* was decided. Petitioner acknowledges the holding in *Summerlin* but argues that the court wrongly decided that *Ring* did not apply retroactively. The decisions of the Supreme Court are binding on this Court, Petitioner's argument notwithstanding.

**B.      Failure to Channel Sentencer's Discretion**

In Claim 4, Petitioner argues that Arizona's capital sentencing scheme fails to sufficiently channel the sentencer's discretion because it provides "little or no direction" on how to weigh and compare mitigation against aggravation. (Dkt. 27 at 40.) Respondents correctly note that the PCR court found this claim precluded under Arizona law because Petitioner could have raised it on appeal but did not. (Dkt. 34 at 51; *see also* ROA-PCR doc. 70 at 31.)

Moreover, this claim is plainly meritless. Arizona's death penalty scheme allows only certain, statutorily defined, aggravating circumstances to be considered in determining eligibility for the death penalty. "The presence of aggravating circumstances serves the purpose of limiting the class of death-eligible defendants, and the Eighth Amendment does not require that these aggravating circumstances be further refined or weighed by [the sentencer]." *Blystone v. Pennsylvania*, 494 U.S. 299, 306-07 (1990). Rulings of both the Ninth Circuit and the United States Supreme Court have upheld Arizona's death penalty statute against allegations that particular aggravating factors do not adequately narrow the sentencer's discretion. *See Lewis v. Jeffers*, 497 U.S. 764, 774-77 (1990); *Walton v. Arizona*, 497 U.S. 639, 649-56 (1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584; *Woratzeck v. Stewart*, 97 F.3d 329, 335 (9th Cir. 1996).

**C.      Equal Protection Violation**

In Claim 5, Petitioner argues that his right to equal protection was violated because

the crimes he committed would not have resulted in death sentences had they been committed in other states.  (Dkt. 27 at 40.)  The PCR court rejected this claim:

> Petitioner presents no basis for an Equal Protection challenge other than Arizona's approach is different than other states.  But the U.S. Supreme Court has ruled that the States enjoy latitude to prescribe the method by which murderers shall be punished.  And as long as the death penalty is not imposed in an arbitrary and capricious manner, it is not unconstitutional by federal or state standards.  The Arizona Supreme Court has held that the death sentence is not cruel and unusual.
>
> An Equal Protection argument rests on the premise that a given statute provides different treatment for similarly situated individuals. Arizona's death penalty statute applies equally to everyone within its jurisdiction.  That Petitioner would not be subject to the same punishment in other states is irrelevant.

(ROA-PCR doc. 70 at 31-32 (citations omitted).)

This claim is plainly meritless.  The Supreme Court has declared that equal protection requires simply that "the State must govern impartially.  General rules that apply evenhandedly to all persons *within* the jurisdiction unquestionably comply with this principle."  *New York City Transit Authority v. Beazer*, 440 U.S. 568, 587 (1979) (emphasis added).  Moreover, as noted by the PCR court, the United States Supreme Court has further held that, within the limits defined by Supreme Court precedent with respect to imposition of a death sentence, "the States enjoy their traditional latitude to prescribe the method by which those who commit murder shall be punished."  *Blystone*, 494 U.S. at 309.  Thus, the fact that some states have chosen not to have a death penalty, or that states which do have death penalties may have different statutory criteria for imposing such a sentence, is insufficient to establish an equal protection violation.  *See id.* ("The fact that other States have enacted different forms  of death penalty statutes which also satisfy constitutional requirements casts no doubt on Pennsylvania's choice.").  The PCR court's ruling was neither contrary to nor an unreasonable application of Supreme Court precedent.

### D.    Unconstitutional Pecuniary Gain Aggravating Factor

In Claim 16, Petitioner challenges the validity of his death sentence based on his contention that the pecuniary gain aggravating factor at A.R.S. § 13-703(F)(5) is

unconstitutional because it fails to narrow the class of persons eligible for the death penalty. (Dkt. 27 at 57.) The Ninth Circuit has expressly denied this claim, and thus it is without merit. *See Woratzeck*, 97 F.3d at 335.

## EVIDENTIARY HEARING

At the start of these proceedings, the Court issued case management and scheduling orders providing Petitioner an opportunity – after completion of his amended petition, the State's answer, and his traverse – to file requests for evidentiary development, including motions for discovery, expansion of the record, or an evidentiary hearing. (Dkt. 5 at 4; Dkt. 21 at 2.) The Court further directed that any motion for evidentiary development shall:

(1) separately identify which enumerated claim(s) and sub-claim(s) Petitioner contends needs further factual development;

(2) with respect to each claim or sub-claim identified in #1, (i) describe with specificity the facts sought to be developed; (ii) identify the specific exhibit(s) Petitioner contends demonstrate or support the existence of each fact sought to be developed; and (iii) explain why such fact(s) and exhibit(s) are relevant with respect to each claim or sub-claim;

(3) with respect to each exhibit and each fact identified in #2, explain in complete detail why such exhibit(s) and such fact(s) sought to be developed were not developed in state court;

(4) with respect to each exhibit and each fact identified in #2, explain in complete detail why the failure to develop such exhibit(s) and such fact(s) in state court was not the result of lack of diligence, in accordance with the Supreme Court's decision in *Williams v. Taylor*, 529 U.S. 420 (2000);

Any motion for evidentiary hearing shall further address:

(5) with respect to each claim or sub-claim identified in #1, explain how the factual allegations, if proved, would entitle Petitioner to relief; and

(6) with respect to each claim or sub-claim identified in #1, whether the state court trier of fact reliably found the relevant facts after a full and fair hearing. *See Jones v. Wood*, 114 F. 3d 1002, 1010 (9th Cir. 1997).

(Dkt. 5 at 4.)

Notwithstanding this directive, Petitioner in his amended petition asserted simply a request for "an evidentiary hearing on each issue raised in this petition." (Dkt. 27 at 59.)

- 65 -

Prior to expiration of the Court's deadline for evidentiary development requests in January 2005, Petitioner sought discovery of materials from the State Bar of Arizona concerning the complaint filed against prosecutor White relating to the kicked-in door issue and requested an additional 45 days to file additional motions for evidentiary development.[12] (Dkts. 47, 50.) The Court denied the motion for a subpoena without prejudice to provide Petitioner an opportunity to obtain the requested materials directly from the State Bar pursuant to Rule 70(c)(6) of the Arizona Rules of the Supreme Court. (Dkt. 53.) The Court granted both the requested continuance and a subsequent request, ultimately directing that any motions for evidentiary development be filed by March 24, 2005. (Dkt. 55.) Petitioner filed none.

Over a year later, in September 2006, Petitioner filed a motion seeking access to the prosecutor's trial file. (Dkt. 56.) Although habeas counsel had reviewed the file years earlier, they asserted that new information revealed during re-sentencing proceedings for co-defendant Nordstrom, whose case was not final at the time *Ring* was decided, indicated that the prosecutor may have withheld some home arrest records for David Nordstrom. (Dkt. 58 at 2.) The Court granted the motion and directed that Respondents arrange for the file review. (Dkt. 59.) Subsequently, Petitioner filed another motion to compel review of the prosecutor's file, asserting that the county attorney had provided access only to its file from his case and not that of co-defendant Nordstrom. (Dkt. 61.) The Court denied this request, finding no good cause for compelled access to Nordstrom's prosecution file because the requested discovery was unrelated to any of the claims pending in the amended petition and amounted to a fishing expedition. (Dkts. 64, 66.)

Although Petitioner's one-sentence request for an evidentiary hearing utterly fails to explain what facts need further development, the Court has considered, pursuant to Rule 8 of the Rules Governing Section 2254 Cases, whether an evidentiary hearing is necessary to resolve any of Petitioner's allegations. As discussed in this order, Petitioner has not alleged

---

[12] During the pendency of the State Bar disciplinary proceedings, White became ill and subsequently died. The matter was closed, and no final report or findings issued.

any facts which, if proved, would entitle him to relief. *See Townsend v. Sain*, 372 U.S. 293, 312-13 (1963). Therefore, Petitioner's request for an evidentiary hearing is denied.

## CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11 of the Rules Governing § 2254 Cases, the Court has evaluated the claims within the petition for suitability for the issuance of a certificate of appealability (COA). *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a COA or state the reasons why such a certificate should not issue. Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate whether the petition states a valid claim of the denial of a constitutional right and whether the court's procedural ruling was correct. *Id.*

The Court finds that reasonable jurists could debate its resolution of Claim 1-A. The Court therefore grants a certificate of appealability as to this claim. For the reasons stated in this Order, the Court declines to issue a certificate of appealability for Petitioner's remaining claims and procedural issues.

Based on the foregoing,

**IT IS ORDERED** that Petitioner's Amended Petition for Writ of Habeas Corpus (Dkt. 27) is **DENIED**. The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that the stay of execution entered by the Court on September 22, 2003 (Dkt. 4) is **VACATED**.

**IT IS FURTHER ORDERED** that a Certificate of Appealability is **GRANTED** as

- 67 -

to the following issue:

Whether Petitioner has established cause to overcome the procedural default of Claim 1-A, which alleges that the prosecutor suborned perjury from detectives to bolster the credibility of Lana Irwin.

**IT IS FURTHER ORDERED** that the Clerk of Court forward a copy of this Order to Rachelle M. Resnick, Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007-3329.

DATED this 28th day of January, 2010.

David C. Bury
United States District Judge

*copy to R. Resnick, Clerk, Arizona Supreme Court on 1/29/10 by cjs*